UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
JOVANY HENRIUS, et al.

                        Plaintiffs,

             -against-                                13-CV-1192 (SJF)(SIL)

COUNTY OF NASSAU, et al.                              **OPINION and ORDER**

                        Defendants.
-------------------------------------------------------------------X
FEUERSTEIN, District Judge:

      Pending before the Court, *inter alia*, are: (1) the unopposed motion of defendants Armor

Correctional Health Services of New York, Inc. ("Armor"), i/s/h "Armour Correctional Health,

Inc.," Dr. Theodora Kay-Njemanzi, Mrs. Miller, "John Doe" and "Jane Doe" (collectively, the

"Armor/Miller defendants") seeking to dismiss all claims asserted against them by consolidated

plaintiff Anthony Tedesco ("Tedesco") pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure ("Rule 12(b)(6)") and the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. §

1997e(a); (2) the unopposed motion of defendants Medical Staff and Dental Staff (collectively,

"the Medical/Dental defendants") seeking to dismiss all claims asserted against them by

consolidated plaintiff Richard Fitzgerald Young ("Young") pursuant to Rule 12(b)(6) and the

PLRA; and (3) the motion of defendants Armor, Dr. C. Sanchez, Michael Parrinello (N.P.) and

Laina Hunt (P.A.) (collectively, "the Armor/Sanchez defendants") seeking to dismiss all claims

asserted against them by consolidated plaintiff Joseph Marone ("Marone") pursuant to Rule

12(b)(6) and the PLRA.  For the reasons set forth below, the motions of the Armor/Miller

defendants and the Armor/Sanchez defendants are granted in part and denied in part and the

motion of the Medical/Dental defendants is granted in its entirety.

I.     BACKGROUND

    A.     Factual Background

        1.     Tedesco's Allegations

Tedesco alleges that he was confined at the Nassau County Correctional Center

("NCCC") as a pretrial detainee from on or about March 23, 2011 through April 6, 2012, and as a

convicted prisoner from on or about August 3, 2012 through December 5, 2012.  (Complaint

filed by Anthony Tedesco, originally assigned docket number 14-cv-1054, ["Tedesco Compl."]

at 1 and ¶ 4).

Tedesco alleges that:

> "[i]nsofar as health/medical services are concerned, (N.C.C.C.) is deliberately
> indifferent to the medical needs of inmates.  These policies and procedures,
> staffing and access to medical care, acute and routine, treatment of communicable
> diseases, medication management, cronic [sic] medical care (records, renewals,
> etc.) drug detoxification, safety and sanitation and quality assurance are deficient
> within the meaning of Estelle v. Gambelle [sic], 429 U.S. 97 (1976)."

(Tedesco Compl., ¶ 11).  However, those allegations are no more than conclusions and, thus, are

not entitled to the assumption of truth applicable to factual allegations on a Rule 12(b)(6) motion.

See Ashcroft v. Iqbal, 556 U.S. 662, 679, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009); Ruston v.

Town Bd. for Town of Skaneateles, 610 F.3d 55, 59 (2d Cir. 2010).

Tedesco further alleges that he has a spinal condition, which he identifies as multiple

compound fractures at T11, T12, L1 and L2 sustained in a motor vehicle accident in or around

1994, resulting in "D.D.D. compressions a degenerative spinal condition that [he] [will] have for

the rest of [his] life[,]" and requiring continuous care.  (Tedesco Compl., ¶¶ 19-20).  According

to Tedesco, "(N.C.C.C.) has been aware of [his] disability for a long, long time[]" and he has

"been complaining of [his] pain and the lack of medical treatment at (N.C.C.C.)[,] [but] (N.C.C.C.) has [been] deliberate[ly] indifferen[t] to [his] medical needs." (Id., ¶ 22). The latter allegation is also conclusory and, thus, not entitled to the assumption of truth.

Specifically, Tedesco alleges, *inter alia*, that on June 20, 2011, (1) "no examination was conducted regarding [his] emergency sick call request[,] [he] was denied a proper medical exam, treatment, and medication for his [chronic spinal] condition * * *[,]" (Tedesco Compl., ¶ 23); and (2) "the medical staff refused treatment and medication, there [was] no one to help [him] and now because of the pain [he] is unable to sleep at night or day [and] he is left with a physical injury that is giving him a mental emotional disorder[,]" (id., ¶ 25).

With respect to his claims against Nurse Miller, Tedesco alleges, *inter alia*, (1) that he was examined by Nurse Miller in the NCCC's medical unit on the morning of July 24, 2011, "[s]hortly after" he complained that he "could not move [his] legs without excruciating pain, and [his] legs would not support [his] body[,]" (Tedesco Compl., ¶ 27), as a result of injuries he sustained from a slip and fall the night before; (2) that "for almost the entire time [he] was in the medical unit," (id., ¶ 31), Nurse Miller "tormented, ridiculed, belittled, and harassed [him][,] * * * called [him] a liar[,] * * * [and] pressured [him] to try to walk to prove [he] was injured[,] * * * caus[ing] [him] extensive pain which magnified [his] injury[,]" (id.; see also id., ¶ 28); (3) that Nurse Miller also caused him pain while putting him on the examining table and when trying to raise his legs to his chest, (id., ¶ 28); and (4) that after approximately one hour[1], Nurse Miller

---

[1] Tedesco alleges that Nurse Miller purportedly harassed him for approximately fifteen (15) minutes, then put him in the hallway to wait; that he waited in the hallway for about ten (10) minutes before Officer Kennedy approached him; that approximately twenty-five (25) minutes later, Nurse Miller and another officer made him attempt to walk and put him on the examination

gave him a pill for the pain, but refused to admit him to the clinic until she was confronted by a sergeant approximately ten (10) minutes later, (id., ¶¶ 28-29).  Thus, Tedesco alleges that "Nurse Miller should have rendered medical treatment promptly as person [sic] in [her] profession were [sic] trained to do[,]" (id., ¶ 30), and that her conduct "show[s] consciencious [sic] punitory [sic] negligence to [him]."  (Id., ¶ 32).

With respect to his claims against Dr. Kay-Njemanzi, Tedesco alleges, *inter alia*, (1) that on his third day in the clinic, i.e., on or about July 26, 2011, Dr. Kay-Njemanzi "wanted [him] to take another x-ray[,]" but he refused after informing her that he "already had a x-ray of [his] back in multiple positions,  * * * was to be scheduled for a M.R.I.[,] [a]s requested by Dr. Dennis Cosstello [sic][,] * * * [and] [did] not want to be exposed to any more radiation from unnecessary x-ray's [sic], * * *[,]" (Tedesco Compl., ¶ 34); (2) that Dr. Kay-Njemanzi then told him that he was "not getting the M.R.I., and [she] [was] taking away [his] wheel chair [sic], and sending [him] back to [his] dorm[,]" (id., ¶ 35); and (3) that he was refused an MRI and Nurse Cris took his wheelchair away  the next night, (id., ¶ 36).

In addition, Tedesco alleges that on August 29, 2011, Dr. Kay-Njemanzi intentionally "stopped [him] from receiving [his] bland diet food tray," which he requires "because of a Gastrointestinal condition[,]" in retaliation for his filing of a grievance against her for her conduct on or about July 26, 2011, (Tedesco Compl., ¶¶ 46-49), as a result of which he had "pain in [his] stomach * * * [and] blood in [his] stool" for "months."  (Id., ¶ 51).

Tedesco seeks, *inter alia*, compensatory damages in the amount of one million dollars

---

table; and that Nurse Miller then left for approximately ten (10) minutes before finally giving him a pill for the pain.  (Tedesco Compl., ¶ 28).

($1,000,000.00); "cosmetic damages" in the amount of two hundred fifty-thousand dollars ($250,000.00); "indeterminate damages" in the amount of one million dollars ($1,000,000.00); and punitive damages in the amount of ten million dollars ($10,000,000.00). (Tedesco Compl., at 31-32).

2.      Young's Allegations

Young alleges, *inter alia*, that from June 30, 2012 until March 10, 2013, while he was incarcerated at the NCCC, "[t]he medical staff inadequately responded to sick-calls[;] [t]he [d]ental staff was poor as well[;] [and] [i]t would take a week or more to see the nurse, doctor or dentist[] * * * [and] a number of sick-calls [sic] request [sic] to get any response." (Complaint filed by Richard Fitzgerald Young, originally assigned docket number 14-cv-1675 ["Young Compl."], ¶ IV). Specifically, Young alleges that after he stumbled in the shower and "infected [his] marriage finger and [] right arm[,]" causing his finger to be swollen and painful, he completed a sick-call request, but he did not see the nurse until a week later. (Id., ¶ IV.A). According to Young, in the interim he "was suffering pain from [his] swollen finger[] [and] [t]he rash was spreading all up [his] right side[,]" as a result of which he sustained "sleepless nights[]" and stress that he would lose his finger. (Id.) Once Young was examined, the nurse, Ms. Reveria, gave him Hydrocortisone cream for the rash and Ms. Hunt prescribed him an antibiotic and Motrin for his finger. (Id.) Young alleges that when the antibiotic did not work, Ms. Hunt "had to cut open [his] finger with a scaple [sic] and squeeze out the pus[] * * * [which] was very painful," (id.), then she "took a culture to find out the appropriate antibiotic for [his] infected finger * * *." (Id.)

Young further alleges that after his "left arm grew red bumps" from an unidentified insect bite, the nurse, Ms. Davis, gave him Hydrocortisone cream. (Young Compl., ¶ IV.A).

Young seeks "[a] portion of the class-action relief." (Young Compl., ¶ V).

### 3. Marone's Allegations

Marone alleges that was incarcerated at the NCCC from May 7, 2014 to May 24, 2014[,] (Complaint filed by Joseph Marone, originally assigned docket number 14-cv-3786 ["Marone Compl."], ¶ IV[1]); and that on May 9, 2014, he submitted a sick call request "regarding the servere [sic] pain [he] was having in [his] left leg due to a [sic] injury that occurred while being incarcerated in [NCCC]." (Id., ¶ IV[2]). However, the Sick Call Request ("SCR") submitted by Marone in opposition to the Armor/Sanchez defendants' motion indicates, in relevant part:

> "NEED to see the doctor concerning my medication that I'm not receiving yet. I take 200 mg [of] Neurontin twice a day. Also I am not getting my H.C. [presumably, high calorie] meal which I lose weight rapidly because of my medical condition."

(Marone Opp., Ex. A). On the bottom of the SCR, Marone wrote: "May 12 [a]bout 7 pm saw Dr. Sanchez. He refuse [sic] to order my medication and special meal. He told me to write a grievance." (Id.) In his complaint, Marone alleges that on May 12, 2013, he was examined by Dr. C. Sanchez, who "refused to prescribe [him] [his] Neurontin medication for [his] neuropathy condition[,]" (Marone Compl., ¶ IV[2]), which had been prescribed to him two (2) to three (3) weeks earlier "in the other part of th[e] [NCCC]."[2] (Id.)

---

[2] Although Marone alleges that he was incarcerated at the NCCC from May 7, 2014, only five (5) days prior to his examination by Dr. Sanchez, he apparently was incarcerated at the NCCC on a previous occasion from on or about April 23, 2014 until May 1, 2014. (See "Release of

On May 13, 2014, Marone submitted another SCR indicating, in relevant part:

> "I am having sharp pains and numbness in my left leg. I'm suppose [sic] to be on Neurontin medication. I have been on it since 2011 and now I'm not receiving it. Also I was getting a H.C. meal and now I am not getting it. My headaches and stomach pains are coming back. Please fix these 2 problems."

(Marone Opp., Ex. A). On the bottom of the SCR, Marone noted:

> "May 14 about 3:30 pm wrote out grievance form explaining that I'm still not receiving my medication nor special meal. 5/15 about 6:30 pm saw [Parrinello] [who] won't prescribe me my meds or meal [and] told me try naperson [sic] for a week then put another sick call in and [illegible] meal if I weight [sic] under 100 lbs he'll give it to me. I weighted [sic] 149 lbs. so he told me I weight [sic] to [sic] much, I'm over 100 lbs."

(Id.)[3]

In the grievance form dated May 14, 2014 ("the May Grievance"), Marone indicated, in relevant part:

> "I am not receiving my medication and H.C. meal. I'm suppose [sic] to be taking 200 mg twice a day of Neurontin for neuropathy in my leg. * * * I've been on this medication since 2011 and I've been prescribed the medication and H.C. meal on 4/2014."

(Marone Opp., Ex. A). Marone requested that he be prescribed Neurontin and the H.C. meal "as written to me by medical in April of [2014]." (Id.)

An Inmate Grievance Receipt ["IGR"] dated May 15, 2014 acknowledges receipt of the May Grievance. (Id.) On the IGR, Marone, wrote:

---

Information" forms dated June 4, 2014 and June 20, 2014, Marone Opp., Ex. A).

[3] In his complaint, Marone alleges, *inter alia*, that on May 15, 2014, he saw Michael Parrinello, a nurse practitioner, who refused to prescribe him medication "for the pain of [his] condition." (Marone Compl., ¶ IV[2]). As that allegation is contradicted by the documentary evidence submitted by Marone in opposition to the Armor/Sanchez defendants' motion, it is not entitled to the assumption of truth.

"CO Rodriges [sic] came 5/20/14 regarding my grievance.  Medical wrote that I weight [sic] 179 lbs on 5/15/14 which [sic] when I was weighted [sic] I was at 149 lbs. [Parrinello] lied to Grievance Officer.  I then denied [sic] to sign grievance and have it appealed to Chief Administrative Officer.  CO Barber was there when the examination occured [sic] along with 2 other officers.

5/28/14 CO Rodrigus [sic] brought grievance and decision was denied saying they have been giving me medicine for my condition and monitoring my weight."

(Marone Opp., Ex. A).

On May 17, 2014, Marone submitted an SCR indicating:

"Still having a lot of pain in my left leg.  Which is causing extreme numbness in my foot and toes.  I am having trouble sleeping at night because of the pain and due to my stomach hurting/ I am extremely under weight and going to bed hungry at night.  Off and on headaches due to being hungry.  I am respectfully requesting my usual medication along with the H.C. meal that I've gotten before because of my medical condition."

(Marone Opp., Ex. A).  On the bottom of the SCR, Marone, wrote, in relevant part, that on May 20, 2014, at approximately 2:30 p.m., his weight was 150-151 pounds and Laina Hunt, the physician's assistant,

"will not prescribe H.C. only for cancer and HIV patients.  Said my sick call was based on meal problem and rushed me out the door.  Also that they do not prescribe anything stronger then [sic] what I was put on now."

(Id.)

Marone submits part of a record referencing the May Grievance that begins mid-sentence under the word "CONTINUED[]" and indicates:

"symptoms although not with Neurontin[.] Choose instead to administer Naprosyn.  Furthermore [Marone's] weight was recorded at 179 lbs.  Therefore a high calorie diet wasn't prescribed. [Marone] may sign up for a sick call should his condition worsens [sic]."

(Marone Opp., Ex. A).

The decision of the grievance coordinator ("GC") on the May Grievance, dated May 19, 2014, is illegible, but on May 20, 2014, Marone indicated thereon that he read and appealed the GC's decision. (Marone Opp., Ex. A).

On May 20, 2014, Marone submitted another SCR indicating, in relevant part:

> "Requesting to have my weight checked. Also my left leg is still numbing out and a lot of pain is radiating though [sic] it. The meds that were prescribed are not helping my condition. I wish to see a specialist and to speak to the medical director."

(Marone Opp., Ex. A). At the bottom of the SCR, Marone wrote:

> "May 22, 2014 approx. 6:45 pm I was called for sick call and seen by [Parrinello] which he tells me that medical is now waiting for blood results before prescribing me the proper medication that I've been taking for 3 year [sic]. [L]ast time I saw him 5/15 he told me that they don't prescribe medication high [sic] then [sic] Naperson [sic] which I knew was false because I've gotten the Neurontin medication here before. * Also I've been put on a 6 week scale check to monitor my weight. Medical is now responding better to my needs, but has taken them almost a month to do so."

(Id.)

On May 21, 2014, at approximately 9:00 a.m., Marone submitted another SCR indicating, in relevant part:

> "I am still having pain in my left leg due to not getting my neurontin medication. When I was in the main part of the [NCCC] they had given me the medication around April 24, 2014. Also around April 26, 2014 I was placed on a H.C. meal due to my weight not being in the range that it is supposed to be. Once again I'm respectfully asking to get what I was already getting about a month ago."

(Marone Opp., Ex. A). At the bottom of the SCR, Marone noted that he was called to the medical unit on May 24, 2014, at approximately 9:00 a.m., to have his weight checked; that his weight was 155 lbs "due to eating commissary that I have receive on 5/[illegible];" and that he was "getting extra food tray for helping out in [his] dorm. 5/20." (Id.)

By decision dated May 23, 2014, the Chief Administrative Officer ("CAO") denied the May Grievance on the basis that Armor was "treating [Marone's] condition with medicine and will monitor [his] weight regarding [his] diet." (Id.) On May 28, 2014, Marone appealed the CAO's decision to the Citizen's Policy and Complaint Review Council ("CPCRC") at the Commission of Correction. (Id.) By decision dated July 15, 2014, the CPCRC denied the May Grievance and "sustain[ed] the action taken by the facility administration." (Id.)

Marone again submitted an SCR on May 25, 2014, at approximately 9:30 a.m., indicating:

> "I am still experiencing pain in my left leg. Its [sic] consent [sic] and the pain has been getting worst [sic]. Also I've notice [sic] a lump in my left foot by my ankle. It hurts a little and it's uncomfortable feeling."

(Marone Opp., Ex. A). At the bottom of the SCR, Marone indicated that on June 1, 2014, he weighed 159.5 pounds and that on May 30, 2014, at approximately 9:30 a.m.,

> "[I] saw [] Parrinello which [sic] finally prescribed my neurontin meds but in a small dose and once a day. Told me if I still have pain write another sick call in 2 weeks and he will up the doseage [sic]. I feel as if they are [deliberately] torturing me and having me go through pain because I'm a [sic] Inmate Patient."

(Id.)

On June 1, 2014, at approximately 3:00 p.m., Marone submitted another SCR indicating,

> "I'm getting shooting pain in the late evening and throughout the night which is keeping me up and disturbing my sleep. I've finally been put on neurontin in the mourning [sic] which is helping."

(Marone Opp., Ex. A). At the bottom of the SCR, Marone indicated that on June 3, 2014, at approximately 7:00 p.m., he weighed 162 pounds. (Id.)

On June 3, 2014, at approximately 1:25 p.m., Marone submitted an SCR indicating, in relevant part,

> "When trying to get my Neurontin medication I was told that I've been discontinued for some reason. I would like to see the medical director. The script was written for 5/30/14 to 6/30/14[.]"

(Marone Opp., Ex. A). In his complaint, Marone alleges that on June 3, 2014, at approximately 7:00 p.m., he was told by a physician's assistant named Francis that Ms. Hunt "had discontinued [him] off the meds [sic] due to [him] not taking them on the outside." (Id., ¶ IV[7]).

On June 3, 2014, Marone submitted a grievance ("the Special Meal Grievance") indicating, in relevant part:

> "This grievance is regarding the previous grievance on 5/14/14 [the May Grievance]. I was told that I was denied the H.C. meal because my weight was 179 lbs which is false. My actual weight is 159.5 lbs as of 6/1/14."

(Marone Opp., Ex. A). In response to the inquiry regarding the documentation or information he had in support of his grievance, Marone wrote, in relevant part: "letter from the Grievance Coordinator saying medical had my weight a [sic] 179 lbs which I lost weight over this past month and now weight [sic] 159.5 which is a 20 lb. difference. This is recorded in my file when called for a weight check 6/4." (Id.) Marone requested "to be placed on the special meal to regain the weight that [he] ha[d] lost[]." (Id.)

On that same date, Marone submitted another grievance ("the Medication Grievance") indicating, in relevant part:

> "On 5/30/14 9:30 am I saw Michael Parrinello which [sic] finally prescribed me the neurontin medication. As of 6/3/14 approx. 1 pm the nurse told me my meds have been discontinued. My pain is starting to come back and soon it will get worse. I feel that P.A. Hunt is being discriminating [sic] toward me."

(Marone Opp., Ex. A). With respect to the documentation or information he had in support of he Medication Grievance, Marone wrote:

> "I was getting the neurontin medication for 3 day [sic] 5/30 to 6/3 after being told the highest medication they would give me is naperson [sic]. I have a prescription on the outside filled at my local pharmacy. Also I've been on this medication since 2011 and is in my previous record in medical."

(Id.) Marone requested that he get his medication back "for it was helping [him] with [his] pain and condition." (Id.) An IGP dated June 5, 2015 acknowledges receipt of Marone's grievance regarding "Medical," although it does not indicate to which grievance, i.e., the Special Meal Grievance or the Medication Grievance, it pertains. (Id.)

Marone alleges that he was put back on Neurontin on June 4, 2014, only one (1) day after it had been discontinued. (Marone Compl., ¶ IV[7]). On that same date, Marone submitted a "Release of Information" form to Armor to obtain his medical records from April 2011 to November 2012; April 23, 2014 to May 1, 2014; and May 7, 2014 "to present." (Marone Opp., Ex. A).[4]

On June 6, 2014, CO Rodriguez of the Grievance Unit sent a memorandum to Marone with respect to the Special Meal Grievance indicating, in relevant part, that Marone "still failed to provide [him] with more information[]" regarding that grievance and requesting that Marone re-submit his original grievance form along with "documentation to support [his] claims[,]" information regarding whether he ever "submit[ted] a sick call slip for [his] diet issue[,]" and "dates and proof[,]" so that the grievance unit could "provide [him] with a complete and thorough investigation." (Marone Opp., Ex. A).

Marone submitted an SCR on June 25, 2014 indicating that he "would like to talk to a

---

[4] On June 20, 2014, Marone submitted a similar authorization to have his medical records disclosed by Armor to his lawyer. (Marone Opp., Ex. A).

Mental Health Counselor.  Having anxiety and bad dreams."  (Marone Opp., Ex. A).  At the bottom of the SCR, Marone indicated that he saw Aaron Cooper "of Mental Health" on June 26, 2014 and that on June 27, 2014, his chest felt tight and he was having a hard time breathing and was sweaty and clammy.  (Id.)

On July 1, 2014, Marone filed a grievance ("the July Grievance") indicating, in relevant part:

> "7-1-14 at 8:45 am I talked to Grievance Officer Magalletti about [the Special Meal Grievance].  He told me to contact C.O. Rodriguez about the grievance that has not been responded to."

(Marone Opp., Ex. A).  Marone further indicated that he submitted sick call slips regarding the Special Meal Grievance, but "[i]ts [sic] been almost a month and haven't heard anything from it."  (Id.)  Marone requested that CO Rodriguez see him "and bring the Grievance with her." (Id.)

On July 3, 2014, at approximately 6:35 p.m., Marone submitted an SCR indicating that he needed to refill his Neurontin medication.  (Marone Opp., Ex. A).

On July 30, 2014, Marone again submitted an SCR indicating, in relevant part, that he needed to refill his Neurontin medication.  (Marone Opp., Ex. A).

Marone alleges that "[i]f [he] was receiving Neurontin medication along with physical therapy [he] would not be experiencing [as] much pain[]" from his neuropathy.  (Id., ¶ IV.A). Marone seeks "to get adequate and timely medical treatment while being incarcerated[] * * * [and] monetary compensation of [$]14,000,000 [fourteen million dollars] * * *."  (Marone Compl., ¶ V).

B.	Procedural History

On or about February 11, 2014, Tedesco commenced an action in this Court against Anthony J. Annucci, and/or his predecessor, as the New York State Commissioner of Corrections; Sheriff Michael Sposato ("Sheriff Sposato"), i/s/h "Sheriff, Mr. Spazato (N.C.C.C.);" the Nassau University Medical Center and its employees Mrs. Davis, "John Doe" and "Jane Doe;" the Armor/Miller defendants; Officer Saeed; Officer Hayman; and "John Doe" and "Jane Doe" employees of the Nassau County Sheriff's Department and the NCCC, which was assigned docket number 14-cv-1054. By order dated April 22, 2014, Tedesco's action was consolidated with the case assigned docket number 13-cv-1192, which is now called Henrius v. County of Nassau ("the Henrius case")[5], the lead case in a number of consolidated cases challenging similar conditions of confinement purportedly existing at the NCCC that were commenced on or after February 28, 2013.

On or about March 12, 2014, Young commenced an action in this Court against Vincent Demarco, Michael Sharkey and the Medical/Dental defendants, which was assigned docket number 14-cv-1675. By order dated April 24, 2014, Young's action was consolidated with the Henrius case.

On or about June 11, 2014, Marone commenced an action in this Court against the County of Nassau, County Executive Edward Mangano; the NCCC; Sheriff Sposato; and the Armor/Sanchez defendants, which was assigned docket number 14-cv-3786. By order dated

---

[5]  At the time Tedesco's complaint was consolidated, the lead case was entitled Reid v. Nassau County Sheriff's Department, et al.  The name was subsequently changed after Reid's claims were dismissed in their entirety with prejudice pursuant to an order dated August 20, 2014. (Doc. No. 149 in lead case).

June 30, 2014, Marone's action was consolidated with the <u>Henrius</u> case.

Pending before the Court, *inter alia*, are: (1) the unopposed motion of the Armor/Miller defendants seeking to dismiss all claims asserted against them by Tedesco pursuant to Rule 12(b)(6) and the PLRA; (2) the unopposed motion of the Medical/Dental defendants seeking to dismiss all claims asserted against them by Young pursuant to Rule 12(b)(6) and the PLRA; and (3) the motion of the Armor/Sanchez defendants seeking to dismiss all claims asserted against them by Marone pursuant to Rule 12(b)(6) and the PLRA, which Marone opposes.

II.     DISCUSSION

   A.     Standard of Review

The standard of review on a motion made pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is that a plaintiff plead sufficient facts "to state a claim for relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 127 S. Ct. 1955, 1974, 167 L. Ed. 2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678, 129 S. Ct. 1937. The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." <u>Id.</u>

"A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" <u>Iqbal</u>, 556 U.S. at 678, 129 S. Ct. 1937 (quoting <u>Twombly</u>, 550 U.S. at 555, 127 S. Ct. 1955). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 557, 127 S. Ct. 1955). "Factual allegations must be enough to raise a right to relief above the

speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. 544, 127 S. Ct. at 1959.

In deciding a motion pursuant to Rule 12(b)(6), the Court must liberally construe the claims, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff. See Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P., 737 F.3d 166, 176 (2d Cir. 2013) (quotations and citation omitted); Grullon v. City of New Haven, 720 F.3d 133, 139 (2d Cir. 2013). However, this tenet "is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678, 129 S. Ct. 1937. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. at 679, 129 S. Ct. 1937. "In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id.; see also Ruston, 610 F.3d 55, 59 (2d Cir. 2010).

Nonetheless, a plaintiff is not required to plead "specific evidence or extra facts beyond what is needed to make the claim plausible." Arista Records, LLC v. Doe 3, 604 F.3d 110, 120-1 (2d Cir. 2010); accord Pension Benefit Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc., 712 F.3d 705, 729-30 (2d Cir. 2013). "When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Iqbal, 556 U.S. at 679, 129 S. Ct. 1937.

In deciding a motion pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the Court must limit itself to the facts alleged in the complaint, which are accepted as true; to any documents attached to the complaint as exhibits or incorporated by reference therein; to matters

16

of which judicial notice may be taken; or to documents upon the terms and effect of which the complaint "relies heavily" and which are, thus, rendered "integral" to the complaint. Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002); see also ASARCO LLC v. Goodwin, 756 F.3d 191, 198 (2d Cir. 2014), cert. denied, 135 S. Ct. 715, 190 L. Ed. 2d 441 (2014).

Moreover, although a *pro se* complaint "must be construed liberally to raise the strongest arguments it suggests[,] * * * [it] must state a plausible claim for relief." Nielsen v. Rabin, 746 F.3d 58, 93 (2d Cir. 2014) (quoting Walker v. Schult, 717 F.3d 119, 124 (2d Cir.2013) (internal citations, quotation marks, and brackets omitted)).

B.      Exhaustion of Administrative Remedies

Section 1997e(a) of the PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[E]xhaustion is mandatory under the PLRA and * * * unexhausted claims cannot be brought in court." Jones v. Bock, 549 U.S. 199, 211, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007); see also Woodford v. Ngo, 548 U.S. 81, 86, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter v. Nussle, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002); accord Johnson v. Killian, 680 F.3d 234, 238 (2d Cir. 2012). "The PLRA attempts to eliminate unwarranted federal-court interference with the administration of prisons, and thus seeks to afford corrections officials time and opportunity to

17

address complaints internally before allowing the initiation of a federal case." Woodford, 548 U.S. at 93, 126 S. Ct. 2378 (alterations, quotations and citation omitted); see also Amador v. Andrews, 655 F.3d 89, 96 (2d Cir. 2011). "The PLRA also was intended to reduce the quantity and improve the quality of prisoner suits." Woodford, 548 U.S. at 93, 126 S. Ct. 2378; see also Porter, 534 U.S. at 524-25.

"[T]he PLRA exhaustion requirement requires proper exhaustion," Woodford, 548 U.S. at 93, 126 S. Ct. 2378; see also Johnson, 680 F.3d at 238, "that is, using all steps that the agency holds out, and doing so properly." Amador, 655 F.3d at 96 (quotations and citation omitted); see also Porter, 534 U.S. at 524; 122 S. Ct. 983 ("All 'available' remedies must * * * be exhausted."); Macias v. Zenk, 495 F.3d 37, 43 (2d Cir. 2007) ("[T]o satisfy the PLRA a prisoner must * * * procedurally exhaust his available administrative remedies." (emphasis omitted)). "This entails both completing the administrative review process in accordance with the applicable procedural rules * * * and providing the level of detail necessary in a grievance to comply with the grievance procedures." Amador, 655 F.3d at 96 (alterations, quotations and citations omitted). "The exhaustion inquiry * * * requires that [the court] look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." Espinal v. Goord, 558 F.3d 119, 124 (2d Cir. 2009); see also Abney v. McGinnis, 380 F.3d 663, 668 (2d Cir. 2004) ("When determining whether an administrative remedy is available, courts should be careful to look at the applicable set of grievance procedures, whether city, state or federal." (quotations and citation omitted)). Merely "alerting the prison officials as to the nature of the wrong for which redress is sought * * * does not constitute 'proper exhaustion' * * *." Macias, 495 F.3d 44 (alterations, quotations and citations

omitted).

The rules and regulations of the New York State Commission of Correction, applicable to the NCCC, see **http://www.scoc.ny.gov/jailaddre.htm#Nassau,** provides a three (3) step process for the handling of inmate grievances. To initiate the process, "[a]n inmate must file a grievance within five days of the date of the act or occurrence giving rise to the grievance[,]" N.Y. Comp. Codes R. & Regs. tit. 9, § 7032.4(d) (2015), with the grievance coordinator designated by the chief administrative officer. Id., § 7032.4(e); see Hill v. Curcione, 657 F.3d 116, 124 (2011) (holding that New York regulations setting forth the minimum standards and regulations for the management of county jails and penitentiaries require complaints about prison conditions to be submitted to the grievance coordinator "within five days of the occurrence giving rise to the grievance.") A "grievance" is defined as "a written inmate complaint concerning either written or unwritten facility policies, procedures, rules, practices, programs or the action or inaction of any person within the facility." N.Y. Comp. Codes R. & Regs., tit. 9, § 7032.2(a). "[A] grievance that is too vague to understand or fails to set forth supporting evidence or information may be returned to the inmate." Id., § 7032.4(f). "Within two business days after receipt of the grievance coordinator's written determination, the grievant may appeal to the chief administrative officer or his designee." Id., § 7032.4(j). "Within three business days of the receipt of the chief administrative officer's determination, any grievant may appeal any grievance denied by the facility administrator, in whole or in part, to the [Citizens' Policy and Complaint Review Council ("CPCRC") of the New York] State Commission of Correction by indicating his/her desire to appeal on the inmate grievance form in the space provided for such purpose." Id., § 7032.5; see Hill, 657 F.3d at 124-25 ("A further appeal may be taken through the Citizens'

Policy and Complaint Review Council of the New York State Commission of Corrections.")

"[F]ailure to exhaust is an affirmative defense under the PLRA, and * * * inmates are not required to specially plead or demonstrate exhaustion in their complaints." <u>Jones</u>, 549 U.S. at 216, 127 S. Ct. 910; <u>accord</u> <u>Grullon</u>, 720 F.3d at 141. "Like other affirmative defenses, failure to exhaust may be grounds for dismissal under Rule 12(b)(6) if the defense appears on the face of the complaint." <u>Walker v. Vargas</u>, No. 11 Civ. 9034(ER), 2013 WL 4792765, at * 4 (S.D.N.Y. Aug. 26, 2013); <u>see</u> <u>Sewell v. Bernardin</u>, 795 F.3d 337, 339 (2d Cir. 2015) ("Dismissal under Fed. R. Civ. P. 12(b)(6) is appropriate when a defendant raises a statutory bar, * * * as an affirmative defense and it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law." (quotations and citation omitted); <u>Kelly-Brown v. Winfrey</u>, 717 F.3d 295, 308 (2d Cir. 2013) ("Affirmative defenses may be adjudicated at th[e] [pleadings] stage in the litigation * * * where the facts necessary to establish the defense are evident on the face of the complaint.").

Moreover, "the affirmative defense of exhaustion is subject to estoppel." <u>Ziemba v. Wezner</u>, 366 F.3d 161, 163 (2d Cir. 2004); <u>see</u> <u>also</u> <u>Ruggiero v. County of Orange</u>, 467 F.3d 170, 178 (2d Cir. 2006). "A prisoner may invoke the doctrine of estoppel when defendants took affirmative action to prevent him from availing himself of grievance procedures." <u>Amador</u>, 655 F.3d at 103 (quotations and citation omitted); <u>see</u> <u>also</u> <u>Ruggiero</u>, 467 F.3d at 178. "[V]erbal and physical threats of retaliation, physical assault, denial of grievance forms or writing implements, and transfers constitute such affirmative action." <u>Amador</u>, 655 F.3d at 103.

The Second Circuit formulated the following three (3)-part test in determining a failure to exhaust affirmative defense:

"Depending on the inmate's explanation for the alleged failure to exhaust, the court must ask whether administrative remedies were in fact available to the prisoner. The court should also inquire as to whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense. If the court finds that administrative remedies were available to the plaintiff, and that the defendants are not estopped and have not forfeited their non-exhaustion defense, but that the plaintiff nevertheless did not exhaust available remedies, the court should consider whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements."

Macias, 495 F.3d at 41 (quoting Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004)); see also Amador, 655 F.3d at 102. "If any of the three parts is satisfied, the prisoner is deemed to have exhausted internal procedures for purposes of the PLRA." Amador, 655 F.3d at 102.


1.      Tedesco's Grievances

Tedesco alleges, *inter alia*, (1) that he filed a grievance with respect to his claims against Dr. Kay-Njemanzi concerning her conduct on or about July 26, 2011, (Tedesco Compl., ¶ 37); and (2) that on or about August 30, 2011, the grievance coordinator, Mrs. Boyce, (a) told him (i) that his grievance was denied, but refused to tell him why, and (ii) that she was reporting on the grievance that he refused to sign it, even though he indicated to her that he wanted to sign the grievance and had marked on the grievance that he wanted to appeal it, and (b) refused (i) to allow him his right to appeal the grievance, (ii) to provide him with a copy of the grievance, and (iii) to provide him with the grievance number and date of the grievance, (id., ¶¶ 55-58). Those allegations are sufficient at the pleadings stage to withstand dismissal for failure to exhaust administrative remedies on the basis that, if proven, defendants may be estopped from raising

Tedesco's failure to exhaust as an affirmative defense with respect to his claims against Dr. Kay-Njemanzi relating to her treatment of him on or about July 26, 2011.

In addition, Tedesco alleges that "[i]t is essential for an inmate to exhaust their [sic] state remedies prior to filing a Lawsuit under [Section 1983]," (id., ¶ 18), but the NCCC "stonewalls the Grievance process[,]" (id., ¶ 17), by setting up a system "so that the Grievances never leave the jail or go to Albany" and depriving the inmates of "any representation on the inmate Grievance Committee." (Id., ¶ 18). Those latter allegations are conclusory and, thus, not entitled to the assumption of truth. In any event, as Tedesco does not allege that he completed even the first step of the grievance procedure with respect to the other conduct challenged in his complaint, including his claim that Dr. Kay-Njemanzi intentionally deprived him of his "bland diet food tray," nor any basis upon which it may reasonably be inferred that administrative remedies were not available to him with respect to such conduct; that defendants may have forfeited, or may be estopped from raising, the affirmative defense of non-exhaustion; or that special circumstances otherwise exist justifying his failure to exhaust those claims, the branch of the Armor/Miller defendants' motion seeking dismissal of Tedesco's Section 1983 claims against them pursuant to the PLRA is granted to the extent that Tedesco's Section 1983 claims against the Armor/Miller defendants, with the exception of his Section 1983 claim based upon Dr. Kay-Njemanzi's medical treatment of him on or about July 26, 2011, are dismissed in their entirety with prejudice for his failure to exhaust administrative remedies.


2.      Young's Grievances

At the time Young filed this action, he was incarcerated at the "Riverview [sic]

Correctional Facility," and was no longer incarcerated at the NCCC.  (Young Compl., ¶ II).
Young alleges that he did not file a grievance with respect to any of his claims because he "ha[s]
not needed to grieve anyone at Riverview [sic] Correctional Facility."  (Id., ¶ II.D).

Since, *inter alia*, it is clear from the face of Young's complaint that he did not exhaust all
available administrative remedies, and there are no allegations in the complaint from which it
may reasonably be inferred that administrative remedies were not available to him with respect to
such conduct; that defendants may have forfeited, or may be estopped from raising, the
affirmative defense of non-exhaustion; or that special circumstances otherwise exist justifying his
failure to exhaust those claims, the branch of the Medical/Dental defendants' motion seeking
dismissal of his Section 1983 claims pursuant to the PLRA is granted and Young's Section 1983
claims against the Medical/Dental defendants are dismissed in their entirety with prejudice for
his failure to exhaust administrative remedies.


            3.      Marone's Grievances

Marone alleges, *inter alia*, that there is a prisoner grievance procedure in the NCCC; that
he spoke with the medical staff, submitted sick call slips and contacted the New York Civil
Liberties Union ("NYCLU"), which called the jail and Sheriff Sposato, regarding his failure to
get his Neurontin medication; and that he submitted a grievance regarding the failure to get his
medication on May 14, 2014.  (Marone Compl., ¶¶ II, IV[2]).  Although Marone also alleges that
"[n]othing was resolved" and that he is "still not receiving Neurontin medication or the [h]igh
[c]alorie meal[,]" (id., ¶ II[C][2]), elsewhere in his complaint he alleges that he was seen by a
nurse practitioner the day after he submitted the grievance and that he was prescribed Neurontin

on May 30, 2014 and again on June 4, 2014, after a one (1)-day interruption.  (Id., ¶ IV[7]).

The documents submitted by Marone in opposition to the Armor/Sanchez defendants'

motion indicate, *inter alia*, that administrative remedies were available to inmates at the NCCC,

i.e., an inmate grievance process that complies with the New York regulations setting forth the

minimum standards and regulations for the management of county jails and penitentiaries; and

that Marone exhausted those administrative remedies with respect to at least the May Grievance,

which pertained to both of his claims against the Armor/Sanchez defendants.  Accordingly, the

branch of the Armor/Sanchez defendants' motion seeking dismissal of Marone's claims against

them based upon his failure to exhaust administrative remedies in accordance with 42 U.S.C. §

1997e(a) is denied.


C.      Section 1983 Claims

Section 1983 of Title 42 of the United States Code provides, in relevant part:

> "[e]very person who, under color of any statute, ordinance,
> regulation, custom, or usage, of any State . . . subjects, or causes to
> be subjected, any citizen of the United States . . . to the deprivation
> of any rights, privileges, or immunities secured by the Constitution
> and laws, shall be liable to the party injured . . . ."

To state a claim under Section 1983, a plaintiff must allege (1) that the challenged conduct was

"committed by a person acting under color of state law," and (2) that such conduct "deprived [the

plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United

States."  Cornejo v. Bell, 592 F.3d 121, 127 (2d Cir. 2010) (quoting Pitchell v. Callan, 13 F.3d

545, 547 (2d Cir. 1994)); see also Rehberg v. Paulk, 132 S. Ct. 1497, 1501-02, 182 L. Ed. 2d 593

(2012).

1.      Deprivation of a Constitutional or Federally Protected Right

Prison officials have a duty, imposed under either the Eighth Amendment with respect to convicted prisoners or the Due Process Clauses of the Fifth and Fourteenth Amendments with respect to pretrial detainees in federal custody and state custody, respectively,[6] to "ensure that inmates receive adequate food, clothing, shelter, and medical care, and [to] take reasonable measures to guarantee the safety of the inmates."  Farmer v. Brennan, 511 U.S. 825, 832-33, 114 S. Ct. 1970, 128 L. Ed. 2d 811 (1994) (quotations and citations omitted).  Tedesco and Marone seek to assert claims against Armor and/or its employees, and Young seeks to assert claims against the Medical/Dental defendants, for deliberate indifference to their serious medical needs. Such claims have both an objective and subjective component.  See Collazo v. Pagano, 656 F.3d 131, 135 (2d Cir. 2011); Hill, 657 F.3d at 122.

The objective component of a deliberate indifference claim requires that "the alleged deprivation * * * be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain, exists."  Hill, 657 F.3d at 122 (quoting Hathaway v. Coughlin, 99 F.3d 550, 553 (2d Cir. 1996)); see also Farmer, 511 U.S. at 834, 114 S. Ct. 1970 ("First, the deprivation alleged must be, objectively, sufficiently serious." (quotations and citation omitted)).  In order to determine whether an alleged deprivation of medical care was objectively serious, the court must inquire (1) whether the inmate was "actually deprived of adequate medical care," i.e., whether the prison officials acted reasonably in response to the

---

[6]  The same "deliberate indifference" standard applies to claims challenging prison conditions regardless of whether the claim is brought under the Eighth Amendment or the Due Process Clauses of the Fifth and Fourteenth Amendments.  See Caiozzo v. Koreman, 581 F.3d 63, 70-1 (2d Cir. 2009).

inmate's medical needs; and (2) "whether the inadequacy in medical care [was] sufficiently serious," i.e., how the challenged conduct was inadequate and what harm, if any, the inadequacy has caused or will likely cause the inmate. Salahuddin v. Goord, 467 F.3d 263, 279-80 (2d Cir. 2006); see also Thompson v. Racette, 519 F. App'x 32, 33-34 (2d Cir. June 4, 2013) (summary order).

"[I]f the unreasonable medical care is a failure to provide any treatment for an inmate's medical condition, courts examine whether the inmate's medical condition is sufficiently serious." Salahuddin, 467 F.3d at 280. "In cases where the inadequacy is in the medical treatment given, the seriousness inquiry is narrower[,]" id., and the focus is "on the alleged inadequate treatment, not the underlying condition alone." Butler v. Furco, No. 13-4663-PR, 2015 WL 5010121, at *1 (2d Cir. Aug. 25, 2015) (summary order). "When the basis for a prisoner's [deliberate indifference] claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in objective terms, sufficiently serious to support a[] [deliberate indifference] claim." Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003) (emphasis, quotations and citations omitted); see also Bellotto v. County of Orange, 248 F. App'x 232, 236 (2d Cir. Sept. 25, 2007) (summary order) ("When a prisoner alleges a temporary delay or interruption in the provision of otherwise adequate medical treatment, [courts] focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." (quotations and citation omitted)). "[I]t's the particular risk of harm faced by a prisoner due to

26

the challenged deprivation of care, rather than the severity of the prisoner's underlying medical condition, considered in the abstract, that is relevant * * *."  Smith, 316 F.3d at 186; see also Salahuddin, 467 F.3d at 280.  In evaluating the objective component of a deliberate indifference claim based upon a delay or interruption in treatment, courts must "focus[] on the particular risks attributable to the missed * * * medication [or other delay or interruption in treatment], rather than on [the plaintiff's underlying medical condition alone] * * *."  Smith, 316 F.3d at 187. Where the "risk of harm" the plaintiff faced as a result of missed medication, or other delay in treatment, is "not substantial," there is no constitutional violation.  Bellotto, 248 F. App'x at 237.

"Subjectively, the official must have acted with the requisite state of mind, the 'equivalent of criminal recklessness,'" Collazo, 656 F.3d at 135 (quoting Hathaway, 99 F.3d at 553); see also Farmer, 511 U.S. at 834, 114 S. Ct. 1970 (holding that the second requirement for a deliberate indifference claim is that a prison official must have acted or failed to act with a "sufficiently culpable state of mind."); Wilson v. Seiter, 501 U.S. 294, 299, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991) (holding that a deliberate indifference claim "mandate[s] inquiry into a prison official's state of mind."), i.e., the official must have "act[ed] or fail[ed] to act while actually aware of a substantial risk that serious inmate harm will result."  Salahuddin, 467 F.3d at 280; see also Farmer, 511 U.S. at 842, 114 S. Ct. 1970; Caiozzo, 581 F.3d at 72 (holding that the plaintiff must establish that the official "knew of and disregarded an excessive risk to [the plaintiff's] health or safety and * * * was both aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and also drew the inference." (alterations and quotations omitted)).  "[D]eliberate indifference describes a state of mind more blameworthy than negligence."  Farmer, 511 U.S. at 835, 114 S. Ct. 1970; see also Walker, 717 F.3d at 125.

Generally, "mere allegations of negligent malpractice do not state a claim of deliberate indifference." Hathaway, 99 F.3d at 553; see also Estelle v. Gamble, 429 U.S. 97, 106, 97 S.Ct. 285, 50 L. Ed. 2d 251 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim * * * under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); Hill, 657 F.3d at 123 ("Medical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness– an act or a failure to act by a prison doctor that evinces a conscious disregard of a substantial risk of serious harm." (quotations and citation omitted)); Hernandez v. Keane, 341 F.3d 137, 144 (2d Cir. 2003) ("'Deliberate indifference' describes a mental state more blameworthy than negligence * * * [and] is a state of mind that is the equivalent of criminal recklessness. * * * A showing of medical malpractice is therefore insufficient to support an Eighth Amendment claim unless the malpractice involves culpable recklessness, i.e., an act or a failure to act * * * that evinces a conscious disregard of a substantial risk of serious harm." (internal quotations and citations omitted)).

Moreover, "a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment." Hill, 657 F.3d at 123; see also Hanrahan v. Mennon, 470 F. App'x 32, 33 (2d Cir. May 18, 2012) (summary order). "[M]ere disagreement over the proper treatment does not create a constitutional claim." Hill, 657 F.3d at 123 (quoting Chance v. Armstrong, 143 F.3d 698, 703 (2d Cir. 1998)); see also Bolden v. County of Sullivan, 523 F. App'x 832, 834 (2d Cir. May 6, 2013) (summary order). "[T]he essential test is one of medical necessity and not one simply of desirability." Hill, 657 F.3d at 123 (quoting Dean v. Coughlin,

804 F.2d 207, 215 (2d Cir. 1986)).

a.    Tedesco's Claims

Except for his claims against Dr. Kay-Njemanzi, the basis of Tedesco's deliberate indifference claims is essentially that on June 20, 2011, there was a temporary interruption in the treatment of his spinal condition by unidentified medical staff who refused to treat him; and that on July 24, 2011, Nurse Miller delayed treating the injuries he sustained the previous evening for approximately one (1) hour.[7]  Thus, with respect to those claims, the focus is on the particular risks attributable to the interruption and delay in treatment.  See Smith, 316 F.3d at 187.

Tedesco alleges only that he was unable to sleep after the unidentified medical staff refused to treat his spinal condition on June 20, 2011, and that he was in pain for the approximate one (1) hour that Nurse Miller delayed treating his injuries on July 24, 2011.  Tedesco does not allege, *inter alia*, that the interruption or delay in treatment exacerbated his spinal condition or injuries or subjected him to an increased risk of harm; nor that he suffered any other

---

[7]  Tedesco's allegations regarding Nurse Miller's bedside manner, and Marone's allegation regarding Parrinello's sarcasm, even if rising to the level of verbal harassment, do not state a claim for a constitutional violation.  See, e.g. Little v. Municipal Corp., 51 F. Supp. 3d 473, 500 (S.D.N.Y. 2014) ("[V]erbal harassment or profanity alone, unaccompanied by any injury, no matter how inappropriate, unprofessional, or reprehensible it might seem, does not constitute the violation of any federally protected right and therefore is not actionable under 42 U.S.C. § 1983." (quotations and citation omitted)); Cotz v. Mastroeni, 476 F. Supp. 2d 332, 372 (S.D.N.Y. 2007) (holding that verbal threats or abuse are not sufficient to state a constitutional violation); Tutora v. Correctional Med. Care, Inc., No. 9:10-cv-0207(MAD/TWD), 2012 WL 1898871, at * 8 (N.D.N.Y. Apr. 30, 2012), report and recommendation adopted by 2012 WL 1898915 (N.D.N.Y. May 23, 2012) ("Although Plaintiff may not have liked the tone that [the defendant] took with him, mere words are not actionable civil rights violations."); Savage v. Brue, No. 9:05-cv-857, 2007 WL 3047110, at * 5 (N.D.N.Y. Oct. 18, 2007) ("[A]n allegation of callous laughter does not, in and of itself, appear to plausibly suggest deliberate indifference[.]")

consequential injurious effects therefrom.  In sum, the lapses in treatment were "minor and inconsequential" and, thus, insufficient to satisfy the objective prong of a Section 1983 deliberate indifference to medical needs claim.  See, e.g. Vansertima v. Department of Corrections, No. 10-cv-3214(RJD), 2012 WL 4503412, at * 6 (E.D.N.Y. Sept. 28, 2012).  As it can not reasonably be inferred from the factual allegations in Tedesco's complaint that he faced a substantial risk of harm as a result of those minor delays and interruptions in treatment, the complaint fails to state a constitutional violation with respect to his claims regarding his treatment on June 20, 2011 and by Nurse Miller on July 24, 2011.  See, e.g. Bellotto, 248 Fed. Appx. at 237.

Tedesco's claim that Dr. Kay-Njemanzi refused to send him for an MRI does not satisfy the objective element of a Section 1983 deliberate indifference claim because he was not actually deprived of adequate medical care.  Although Tedesco alleges that Dr. "Cosstello" recommended that he undergo an MRI of his back, Dr. Kay-Njemanzi determined instead that he should first have x-rays taken of his back, which Tedesco refused to do.  "While, '[i]n certain instances, a physician may be deliberately indifferent if he or she consciously chooses an easier and less efficacious treatment plan,'" Thompson, 519 F. App'x at 34 (quoting Chance, 143 F.3d at 703 (internal quotation marks omitted)), Tedesco has not alleged any facts from which it may reasonably be inferred that Dr. Kay-Njemanzi's recommendation to send Tedesco for an x-ray was any less efficacious than Dr. "Cosstello's" recommendation to send him for an MRI, see id., nor that the refusal to send Tedesco for an MRI exacerbated his injuries, subjected him to an increased risk of harm, or had any injurious effect upon him.  "[M]ere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth

Amendment violation." Chance, 143 F.3d at 703; see also Hill, 657 F.3d at 123 ("It has long been the rule that a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment.") Moreover, there are no factual allegations in Tedesco's complaint from which it may reasonably be inferred that Dr. Kay-Njemanzi acted with a sufficiently culpable state of mind in failing to provide Tedesco with the treatment he desired when he refused to follow her recommended course of treatment. Accordingly, the branch of the Armor/Miller defendants' motion seeking dismissal of Tedesco's Section 1983 claims against them pursuant to Rule 12(b)(6) is granted to the extent that Tedesco's Section 1983 claims against Nurse Miller and the unidentified employees of Armor who treated Tedesco on June 20, 2011, and his claim relating to Dr. Kay-Njemanzi's treatment of him on or about July 26, 2011, are dismissed in their entirety with prejudice for failure to state a claim for relief, and the motion is otherwise denied.[8]


b.      Young's Allegations

Initially, since Young does not allege the personal involvement of anyone from the dental

_____

[8]  Although Tedesco's claim that he experienced stomach pain and blood in his stool "for months" after Dr. Kay-Njemanzi intentionally deprived him of receiving his "bland diet food tray" in retaliation for his filing of a grievance against her may be sufficient to satisfy both components of a deliberate indifference claim at the pleadings stage[,] see, e.g. Rodriguez v. Warden, Metro. Corr. Facility, No. 13 Civ. 3643, 2015 WL 857817, at * 13 (S.D.N.Y. Feb. 27, 2015) (finding that blood in the stool, inter alia, persisting for a "prolonged period of time" presents "a serious risk of harm to [the plaintiff's] health and safety" sufficient to satisfy the objective element of a deliberate indifference claim); Archer v. Dutcher, 733 F.2d 14, 17 (2d Cir. 1984) (finding that the subjective element may be met where "legitimate medical claims were deliberately disregarded as punishment for past breaches of the disciplinary code, or for other invalid reasons"), for the reasons set forth above, that claim is dismissed for Tedesco's failure to exhaust administrative remedies in accordance with the PLRA.

staff in the purported conduct challenged in his complaint, his complaint fails to state a Section 1983 cause of action against the Dental Staff as a matter of law.  See Littlejohn v. City of New York, 795 F.3d 297, 314 (2d Cir. 2015) ("An individual may be held liable under * * * [Section] 1983 only if that individual is personally involved in the alleged deprivation. (quotations and citation omitted)); Spavone v. New York State Dep't of Corr. Servs., 719 F.3d 127, 135 (2d Cir. 2013) ("[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983. (quotations and citation omitted)).  Moreover, Young does not allege any delay in treating the insect bite; nor does he challenge the adequacy of such treatment.  Accordingly, that allegation fails to state a plausible claim for a deprivation of a constitutional or federally protected right.

Assuming, *arguendo*, that Young's allegations that there was a one (1) week delay in providing him medical treatment for an infection on his finger and that the delay exacerbated the infection are sufficient to satisfy the objective element of a Section 1983 deliberate indifference claim, his complaint is devoid of any factual allegations from which it may reasonably be inferred that the Medical Staff acted with the requisite culpable state of mind.  Indeed, the complaint does not even contain any allegations from which the cause of the purported delay may reasonably be inferred.  Accordingly, the branch of the Medical/Dental defendants' motion seeking dismissal of Young's Section 1983 claims against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted and Young's Section 1983 claims against the Medical/Dental defendants are dismissed in their entirety with prejudice for failure to state a claim for relief.

c.    Marone's Claims

Marone essentially alleges that there was delay in prescribing him pain medication for his purported neuropathy condition; that there was a one (1)-day interruption in his medication, purportedly caused by Ms. Hunt, once the medication was prescribed; and that he was never prescribed a high calorie diet. The documents submitted by Marone in opposition to the Armor/Sanchez defendants' motion establish, *inter alia*, (a) that he submitted his first SCR on May 9, 2014, two (2) days after returning to the NCCC, indicating only that he was not receiving the Neurontin he had previously taken nor the high calorie diet he needed because he lost weight rapidly due to an unspecified medical condition; (b) that he was examined by Dr. Sanchez within three (3) days of submitting the first SCR, but Dr. Sanchez refused to prescribe him the Neurontin and high calorie diet; (c) that the day after Dr. Sanchez refused to prescribe the Neurontin or high calorie diet, he submitted a second SCR, this time indicating, *inter alia*, (i) that he was experiencing sharp pains and numbness in his left leg, (ii) that he had been taking Neurontin since 2011 and had previously been given a high calorie diet, and (iii) that he was experiencing headaches and stomach pains since he was no longer getting the high calorie meal; (d) that two (2) days after submitting the second SCR, and less than one (1) week after submitting the first SCR, he was seen by Parrinello, who (i) prescribed him a different pain killer than the one he requested, i.e., Naprosyn, to try for one (1) week, and (ii) informed him that he did not qualify to receive a high calorie diet at that time; (e) that two (2) days after Parrinello prescribed him Naprosyn to try for one (1) week, he submitted a third SCR indicating (i) that he was still having pain in his left leg and "extreme numbness" in his foot and toes, (ii) that he was having trouble sleeping due to the leg pain and stomach pain, and (iii) that he was getting

33

headaches because he was hungry, and again requesting that he be prescribed his "usual medication" and a high calorie diet; (f) that three (3) days after submitting the third SCR, he weighed 150-151 pounds and was treated by Ms. Hunt, who refused (i) to prescribe him a high calorie diet on the basis that such diets were only prescribed for patients with cancer or HIV and (ii) to prescribe him Neurontin on the basis that "they" did not prescribe medication stronger than Naprosyn; (g) that five (5) days after Parrinello had prescribed him Naprosyn to try for one (1) week, he submitted a fourth SCR (i) indicating that he still had pain and numbness in his left leg and that the Naprosyn was not helping his condition and (ii) requesting that his weight be checked, that he be seen by a specialist and that he speak with the medical director; (h) that the day after submitting the fourth SCR, and only six (6) days after Parrinello had prescribed him Naprosyn to try for one (1) week, he submitted a fifth SCR indicating that he was still having pain in his left leg and that he had been prescribed Neurontin and a high calorie diet while previously incarcerated in the "main part" of the NCCC less than one (1) month earlier;  (j) that two (2) days after submitting the fourth SCR, and one (1) day after submitting the fifth SCR, he was seen by Parrinello, who told him (i) that he was awaiting the results of Marone's blood tests before prescribing him Neurontin and (ii) that his weight would be checked every six (6) weeks to monitor his condition; (k) that two (2) days later, he was again seen in the medical unit to have his weight checked, at which time he weighed approximately five (5) pounds more than he had when Ms. Hunt weighed him four (4) days earlier; (*l*) that the next day, and three (3) days after Parrinello told him that he was awaiting Marone's blood test results before prescribing him Neurontin, he submitted a sixth SCR indicating, in relevant part, that the pain in his left leg was worsening; (m) that five (5) days after submitting the sixth SCR, and eight (8) days after

Parrinello told him he was awaiting the blood test results, Parrinello prescribed him Neurontin, but at a smaller dose than he had previously been prescribed, and told him that he would increase the dosage in two (2) weeks if he was still experiencing pain; (n) that the next day, (i) he weighed four a half (4.5) pounds more than he had eight (8) days earlier and (ii) he submitted a seventh SCR indicating that the Neurontin was helping, but he was getting shooting pains in his leg in the late evening and at night which disturbed his sleep; (o) that two (2) days later, (i) he weighed two and a half (2.5) pounds more than he had two (2) days earlier, and (ii) he submitted an eighth SCR indicating that he was told (A) that his Neurontin had been discontinued "for some reason" and (B) by a physician's assistant named Francis that Ms. Hunt had discontinued his medication because he had not been taken it "on the outside;" (p) that the following day, he was put back on the Neurontin; and (q) that he continued to be administered Neurontin until no later than July 30, 2014. There is no indication that any medical personnel ever prescribed, nor that Marone ever even requested, physical therapy for his neuropathy.

Marone generally received adequate medical treatment, albeit not the treatment he desired, within two (2) to three (3) days, and no more than five (5) days, after submitting an SCR, and his disagreement over the treatment he received does not state a claim for the deprivation of a constitutional or federally protected right. See Hill, 657 F.3d at 123; Chance, 143 F.3d at 703. "Where the care provided is otherwise adequate, disagreements over medications and forms of treatment are not adequate grounds for a Section 1983 claim, for these issues implicate medical judgments." Alster v. Goord, 745 F. Supp. 2d 317, 335 (S.D.N.Y. 2010) (quotations, brackets and citation omitted); see also Price v. Reilly, 697 F. Supp. 2d 344, 360 (E.D.N.Y. 2010) ("[M]ere disagreement with a prescribed medication dosage is insufficient as a matter of law to

establish the subjective prong of deliberate indifference.)  At most, the facts alleged in Marone's complaint, and established by the documents he submitted, state a claim for medical malpractice, which, absent any evidence of culpable recklessness, are insufficient to state a claim of deliberate indifference, see Estelle, 429 U.S. at 106, 97 S. Ct. 285, and Marone has not alleged any facts supporting a reasonable inference that any of the Armor/Sanchez defendants acted with the requisite culpable state of mind.  Accordingly, the branch of the Armor/Sanchez defendants' motion seeking dismissal of Marone's Section 1983 claims against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted and Marone's Section 1983 claims against the Armor/Sanchez defendants are dismissed in their entirety with prejudice for failure to state a claim for relief.

2.      Claims against Armor[9]

"Private employers [acting under color of state law] are not liable under Section 1983 for the constitutional torts of their employees * * * unless the plaintiff proves that action pursuant to official . . . *policy* of some nature caused a constitutional tort."  Rojas v. Alexander's Dep't Store, Inc., 924 F.2d 406, 408 (2d Cir. 1990); see also Green v. City of New York, 465 F.3d 65, 82 (2d Cir. 2006) (finding that a hospital was not vicariously liable for any constitutional torts that its employees may have committed).  To prevail on a Section 1983 claim against a municipality or private company acting under color of state law, a plaintiff must show: "(1) actions taken under color of law; (2) deprivation of a constitutional or statutory right; (3) causation; (4) damages; and

_____

[9]  Only Tedesco and Marone assert claims directly against Armor.

(5) that an official policy of the municipality [or private company acting under color of state law] caused the constitutional injury." Roe v. City of Waterbury, 542 F.3d 31, 36 (2d Cir. 2008); see also Connick v. Thompson, 563 U.S. 51, 131 S. Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011) ("Plaintiffs who seek to impose liability on local governments under Section 1983 must prove that 'action pursuant to official municipal policy' caused their injury." (quoting Monell v. Department of Soc. Servs. of City of New York, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)); Rojas, 924 F.2d at 409 ("Although Monell dealt with municipal employers, its rationale has been extended to private businesses [acting under color of state law].") For purposes of this motion, damages are presumed. Moreover, although Armor is a private company contracted to perform medical services for prisoners at the NCCC, see, e.g., Briel v. Sposato, No. 12-CV-2868, 2012 WL 3697806, at *5 (E.D.N.Y. Aug. 21, 2012), "anyone whose conduct is 'fairly attributable to the state' can be sued as a state actor under § 1983." Filarsky v. Delia, --- U.S. ----, 132 S. Ct. 1657, 1661, 182 L. Ed. 2d 662 (2012); see also Hollander v. Copacabana Nightclub, 624 F.3d 30, 33 (2d Cir. 2010). As the entity with which the NCCC contracted to provide medical services to its prisoners, Armor was acting under color of state law for purposes of Section 1983 with respect to its duties in rendering such medical services to the Armor plaintiffs. See West v. Atkins, 487 U.S. 42, 54, 108 S. Ct. 2250, 101 L. Ed. 2d 40 (1988) (holding that a physician employed to provide medical services to state prisoners "acted under color of state law for purposes of Section 1983 when undertaking his duties in treating [the plaintiff's] injuries.")

However, for the reasons set forth above, with the exception of Tedesco's claim that Dr. Kay-Njemanzi deprived him of a "bland diet food tray," which is dismissed for failure to exhaust

administrative remedies, the allegations in Tedesco's and Marone's complaints fail to state a plausible claim of a deprivation of a constitutional or federally protected right.

Moreover, the allegations in Tedesco's and Marone's complaints fail to state a plausible claim of an official policy or custom. "Official * * * policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." Connick, 563 U.S. 51, 131 S. Ct. at 1359. In addition, liability can be established "by showing that a policymaking official ordered or ratified the employee's actions - either expressly or tacitly." Jones v. Town of East Haven, 691 F.3d 72, 81 (2d Cir. 2012), cert. denied, 134 S. Ct. 125, 187 L. Ed. 2d 255 (2013). "Thus, a plaintiff can prevail against a municipality [or private company acting under color of state law] by showing that the policymaking official was aware of the employee's unconstitutional actions and consciously chose to ignore them." Id. To establish such deliberate indifference, "a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights." Id.

a.      Tedesco's Claims

An official policy or custom of Armor cannot be inferred from Tedesco's allegations in his complaint due to, *inter alia*, his failure to allege the personal involvement of any employee of Armor with final policymaking authority in the conduct alleged in his complaint or that any policymaking official was even aware of the conduct plausibly rising to the level of a constitutional violation, i.e., one (1) occasion where Dr. Kay-Njemanzi purportedly retaliated

against him for his filing of a grievance against her, much less "consciously chose to ignore [it]." Jones, 691 F.3d at 81; see also Giaccio v. City of New York, 308 F. App'x 470, 472 (2d Cir. Jan. 23, 2009) (holding that isolated incidents by non-policymaking employees are insufficient to find a policy or custom under Monell). Accordingly, the branch of the Armor/Miller defendants' motion seeking dismissal of Tedesco's claims against Armor pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is granted and Tedesco's Section 1983 claims against Armor are dismissed in their entirety with prejudice for failure to state a claim for relief.

b.      Marone's Claims

Marone's sole allegation against Armor, i.e., that Armor "continues to make oversight on medical policies and procedures practiced at the [NCCC][,]" (Marone Compl., ¶ IV[2]), is insufficient to state a Section 1983 Monell claim against Armor. See, e.g. Biswas v. City of New York, 973 F. Supp. 2d 504, 539 (S.D.N.Y. 2013) appeal dismissed sub nom. Biswas v. Kwait, 576 F. App'x 58 (2d Cir. 2014), as amended (Aug. 28, 2014) ("[C]onclusory, boilerplate allegations are insufficient to state a claim based on the existence of an official policy."); Solomon v. Nassau Cnty., 759 F. Supp. 2d 251, 263 (E.D.N.Y. 2011) ("Conclusory allegations of municipal custom or policy are insufficient to satisfy [Monell].") Accordingly, the branch of the Armor/Sanchez defendants' motion seeking dismissal of Marone's Section 1983 claims against Armor pursuant to Rule 12(b)(6) is granted and Marone's Section 1983 claims against Armor are dismissed in their entirety with prejudice for failure to state a claim for relief.

3.      Claims for Declaratory and Injunctive Relief

"[A]n inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility." Salahuddin, 467 F.3d at 272; accord Shepherd v. Goord, 662 F.3d 603, 610 (2d Cir. 2011).  Since Tedesco and Marone are no longer incarcerated at the NCCC, the branches of the Armor/Miller defendants' and Armor/Sanchez defendants' motions seeking dismissal of their claims for injunctive and declaratory relief are granted and Tedesco's claims for injunctive and declaratory relief, and Marone's claim for injunctive relief, are dismissed in their entirety as moot.


III.    CONCLUSION

For the reasons set forth above, (1) the Armor/Miller defendants' motion seeking dismissal of Tedesco's Section 1983 claims against them pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure and the PLRA is granted to the extent that (a) with the exception of Tedesco's claim that Dr. Kay-Njemanzi deprived him of a "bland diet food tray," his Section 1983 claims against the Armor/Miller defendants are dismissed in their entirety with prejudice for failure to state a claim for relief, and (b) with the exception of Tedesco's claim regarding Dr. Kay-Njemanzi's treatment of him on or about July 26, 2011, his Section 1983 claims against the Armor/Miller defendants are dismissed in their entirety with prejudice for his failure to exhaust administrative remedies, and the Armor/Miller defendants' motion is otherwise denied; (2) the Medical/Dental defendants' motion seeking dismissal of Young Section 1983 claims against them pursuant to Rule 12(b)(6) and the PLRA is granted and Young's Section 1983 claims against the Medical/Dental defendants are dismissed in their entirety with prejudice for failure to

exhaust administrative remedies and to state a claim for relief; and (3) the branch of the Armor/Sanchez defendants' motion seeking dismissal of Marone's Section 1983 claims against them pursuant to Rule 12(b)(6) is granted and Marone's Section 1983 claims against the Armor/Sanchez defendants are dismissed in their entirety with prejudice for failure to state a claim for relief, and the motion is otherwise denied. There being no just reason for delay, the Clerk of the Court shall enter judgment (1) in favor of the Armor/Miller defendants on Tedesco's claims against them; (2) in favor of the Medical/Dental defendants on Young's claims against them; and (3) in favor of the Armor/Sanchez defendants on Marone's claims against them, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. Pursuant to Rule 77(d)(1) of the Federal Rules of Civil Procedure, the Clerk of the Court is directed to serve notice of entry of this order upon all current parties to the consolidated action in accordance with Rule 5(b) of the Federal Rules of Civil Procedure.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of any appeal. See Coppedge v. United States, 369 U.S. 438, 444-45, 82 S. Ct. 917, 8 L. Ed.2d 21 (1962).


SO ORDERED.

_____/s/_____
Sandra J. Feuerstein
United States District Judge

Dated: September 16, 2015
        Central Islip, New York