UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
JOVANY HENRIUS, et al.

Plaintiffs,

-against-                                13-CV-1192 (SJF)(SIL)

COUNTY OF NASSAU, et al.                 **OPINION and ORDER**

Defendants.
-----------------------------------------------------------------X
FEUERSTEIN, District Judge:

Pending before the Court is the unopposed motion of defendants Michael J. Sposato

("Sposato"), in his individual capacity; the County of Nassau ("the County"); and "John Doe #1"

and "John Doe #2," individually and in their official capacity as "County Cooks for Nassau

County Correction Center ['NCCC']" (collectively, "defendants"), seeking, *inter alia*, summary

judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing the remaining

claims of consolidated *pro se* plaintiff Jovany Henrius ("Henrius") in this action in their entirety

with prejudice for his failure to exhaust available administrative remedies.[1]  Although Henrius

was served with defendants' motion on August 20, 2018, (*see* DE 527, 535), he has not filed any

response to the motion, nor sought an extension of time to do so. Accordingly, by order dated

January 2, 2019, the Court granted defendants' application to file the motion as unopposed. On

that same date, defendants served a copy of the January 2, 2019 order upon Henrius by mailing a

copy thereof to him at his last known address. (DE 538). For the reasons set forth below,

---

[1] By order dated August 20, 2014, *inter alia*, all of the consolidated plaintiffs' claims against Sposato in his official capacity, and Henrius's state law claims and claims against Armor Correctional Health Service of New York, Inc. ("Armor"), were dismissed in their entirety with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure for failure to state a claim for relief. (Docket Entry ["DE"] 149).

defendants' motion is granted in its entirety.

I.    BACKGROUND

On or about April 11, 2013, Henrius commenced a civil rights action pursuant to 42

U.S.C. § 1983 ("Section 1983") in this Court against the County and Sposato challenging the

conditions of confinement at the NCCC, which was assigned docket number 13-cv-2349. By

Order dated May 20, 2013, *inter alia*: (i) eleven (11) actions brought by incarcerated *pro se*

plaintiffs challenging the conditions at the NCCC, including Henrius's action, were consolidated

for all purposes to proceed under the lead case, *Reid, et al. v. Nassau County Sheriff's*

*Department, et al.*, No. 13-cv-1192[2]; and (ii) all subsequently filed *pro se* actions relating to the

subject matter of the consolidated action were directed to be consolidated under the lead case

docket number. Currently, Henrius is the only plaintiff remaining in the consolidated action; the

claims of all other consolidated plaintiffs have previously been dismissed at various times

throughout this litigation.

On or about June 7, 2013, Henrius, together with three (3) other consolidated plaintiffs,

filed an amended complaint in the consolidated action.[3] (DE 8). In the amended complaint,

---

[2] The name of the lead case was subsequently changed after the claims of the original plaintiff, Dwayne M. Reid, were dismissed in their entirety with prejudice pursuant to the August 20, 2014 order. (DE 149).

[3] The claims of the other three (3) consolidated plaintiffs, Johans Cabrera, Abigail Torres and Guillermo Torres, were dismissed in their entirety pursuant to the August 20, 2014 order (DE 149) and orders dated March 27, 2017 (Abigail Torres), (DE 407); May 19, 2015 (Guillermo Torres), (DE 283); and December 18, 2013 (Johans Cabrera), (DE 57). Accordingly, the only claims in the amended complaint remaining in this action are Henrius's Section 1983 conditions of confinement claims against the County; Sposato, in his individual capacity; and the County Cooks.

Henrius alleges, *inter alia*, (i) that he was detained in the NCCC since May of 2011[4], (Amended Complaint ["Amend. Compl."], ¶ 9), and (ii) that inmates at the NCCC, including himself: (A) "are subjected to inhumane conditions that have pose [sic] unreasonable and substantial risk to . . . [their] health[,]" (*id.*, ¶ 1); (B) "are force [sic] to live in the amidst [sic] of filth, overflowing backups of sewage of stilled water in showers, cells with chipped peeling paint, dried human fecal matters and foods encrusted on walls, ceiling, poor ventilation, inadequate cleaning supplies, insect and rodent populations, sinks and toilets in cells[] don't work properly, cells that are too cold, poorly prepared, unsanitary and unwholesome meals, water leaking ceilings, [i]nadequate medical treatment, . . . [and] [c]ooks not following illness inmates [sic] and plaintiffs [sic] diet meals[] or State provided nutritionally [sic] guidelines[,]" (*id.*); (C) "lack access to Safe Foods, proper medical diets, as well as basic necessities such are [s]anitary and properly [f]unctioning sinks, toilets, and showers, rodents, and insects invade . . . [their]living areas and [c]ontaminate [their] foods[,]" (*id.*, ¶ 2); (D) "sleep in freezing cells" in the winter and "attempt to fight off the cold cells with a single worn blanket[,]" (*id.*); (E) are housed in "unsanitary" cells with toilets and "poor ventilation," (*id.*, ¶ 21); (F) "are force [sic] to live in [s]qualid unhygienic and hazardous living conditions that pose a substantial and ongoing risk to [their] physical and mental health[,]" (*id.*); (G) "are subjected to cells with [1] chipped peeling paint on walls believed to obtain [sic] led [sic], . . . [2] walls . . . encrusted with human feces stains, [3] toilet and sinks . . . [that] are very out-dated[] and don't work properly, . . . [4] toilet

---

[4] According to defendants, Henrius "is a *former* inmate of the NCCC." (Defendants' Rule 56.1 Statement ["Def. 56.1"], ¶ 10) (emphasis added). As set forth below, that fact is deemed undisputed. In any event, the Court's docket reflects that Henrius sent a notice of change of address to the Court on April 27, 2015, advising that his address was changed from the NCCC to an address in Brooklyn, which is his current address of record. (DE 279).

seats [that] have accrued filth over time, as a result of the frequent waste, [which] has caused [them] to suffer from rashes on their buttocks, and infections[,] . . . [5] no ventilation[,] . . . [6] air-ducts [that] are clogged with rust and mold, and . . . [7] windows [that] are 'sealed shut[,]'" (*id.*); (H) "are subjected to numerous [c]ockroaches [c]rawling everywhere, including biting [them] on their 'arms and faces' at night, causing [them] infections on their bodies[,]" (*id.*, ¶ 22); (I) "have to deal with active infestation of mice's [sic], that run around during the night[] . . . [and] eat [their] foods [sic] purchase[d] from [the] [c]ommissary[,]" (*id.*, ¶ 23); (J) "have numerous mice feces[] inside the only drinking cup that are giving to them[,] . . . [which] 'obsord' [sic] the mices [sic] feces that carry disease and harmful parasites or even hepatitis to add more serious conditions to [their] health[,]" (*id.*); (K) are "being served unhealthy, unsanitary foods . . . infested with insects and mice droppings[,]" (*id.*, ¶ 24; *see also id.*, ¶ 35); (L) "are being underfed, and the food quanitity [sic] and quality . . . has [sic] been 400 [c]alories each day, below the nationally recommended based 2000 [c]alories diet allowance for [them] . . . [which] has subjected [them] to contract severe migraines [sic] headaches, dizzy spells, and during the night time, stomach ache and pains[,]" (*id.*); (M) "are subjected to showers, that are [c]over [sic] in black mole [sic], mildew, stilled water of sewage backups on the flooring shower drains, that are frequently clogged and subjected [them] to contract severe fungal infection [sic] on their feets [sic][,]" (*id..*, ¶ 25); and (N) "live in very cold temperature in cells, during the winter months . . . [,]" as a result of which they "'must' wear all of their County issuing [sic] clothing, a pair of socks on their hands and a towel wrap [sic] around [their] faces, to protect from the cold[,]" which "disrupts . . . [their] sleeping patterns" and causes them "stress." (*Id.*, ¶ 27).

According to Henrius, the County defendants: (i) "have known about the appalling un-[s]anitary [sic] [c]onditions and [p]oor medical treatment in the NCCC after numerous [c]omplaints from [himself] as well as other-inmates [sic] including State Official's [sic], but . . . have failed to make reasonable efforts to remedy these . . . conditions[,]" (Amend. Compl., ¶ 5; *see also id.*, ¶¶ 51, 52); (ii) have ignored the "numerous complaints about the conditions of the showers . . . and have not fixed the showers[,]" (*id.*, ¶ 25); (iii) have refused or ignored requests for adequate cleaning supplies "to remove the mold" on the showers, (*id.*, ¶ 26), and "to try to remove the human encrusted [f]eces on walls in cells and clean the toilets in cells, including mold . . . [,]" (*id.*, ¶ 28); (iv) have not provided him with "his proper vegetarian diet meals, prescribe [sic] by Doctor's [sic][,]" (*id.*, ¶ 35), "intentionally serve [him] 'meats' inside of his meals throughout the day[,]" (*id.*), and have provided "no remedy" to him despite his "numerous grievances," (*id.*); (v) have "a history of sanitation problems in the NCCC[,]" (*id.*, ¶ 37); and (vi) "either ratified these acts or condoned them to such a degree, that they became part of the policy, custom, practice, and procedures of the County and Sposato, . . . [which] violated [his] . . . [c]onstitutional [rights]." (*Id.*, ¶ 53).

Henrius alleges that he and other inmates at the NCCC "suffer from [c]hronic ailments, including persistent and recurring digestive issues, mental issues, stomach pains, skin and head infections, rashes, severe migrain [sic] headaches and dizzy spells and . . . are at current and ongoing risk of suffering from more serious ailments in the future[,]" as a result of the "poor conditions . . . at the NCCC." (Amend. Compl., ¶ 3; *see also Id*, ¶ 13 [alleging that Henrius, "as well as other inmates . . . suffered intestinal illness, skin rashes, infection on their heads, infections on their buttocks, fungal infections, headaches, poor medical care, unsanitary foods,

improper health food diets for medically ill plaintiffs and mental disordered [sic]"]; and *Id.*, ¶ 35 ["Defendants . . . have subjected [Henrius] to be underfed, that have caused [him], severe migraine headaches, and dizzy spells, including stomach ache and pains during the night throughout each day and present"]).

Henrius's remaining claims in the amended complaint assert, *inter alia*, two (2) causes of action pursuant to Section 1983 for violations of his due process rights under the Fourteenth Amendment to the United States Constitution and the right to be free from cruel and unusual punishment under the Eighth Amendment to the United States Constitution (first and second causes of action, respectively); and seek, *inter alia*, (i) injunctive relief "in the form of an appropriate remedial order to improve the [c]onditions in the NCCC, to meet minium [sic] Constitutionally acceptable [s]tandards," (Amend. Compl., ¶ 5), and "enjoin[ing] [d]efendants, and their successors, from subjecting [Henrius] and other inmates in the NCCC to unsanitary, unhealthy, and unsafe conditions, and requir[ing] that a remedy be formulated, subject to Court's approval and modification, if necessary, to end the inhumane conditions described herein at the NCCC[,]" (*id.* at 22-23); (ii) judgment declaring that "subjecting [Henrius] to the conditions described [in the amended complaint] violates the Eighth and Fourteenth Amendments to the United States Constitution[,]" (*id.* at 22); and (iii) "money damages to redress Defendants [sic] violations of [Henrius's] rights under the Eighth and Fourteenth Amendments to the United States Constitution . . . ." (*Id.*, ¶ 5; *see also Id.*, ¶ 14 [alleging that Henrius "sues for injunctive relief, declaratory relief, [c]ompensatory damages and punitive damages"]; and *Id.* at 23 [seeking an award of compensatory damages, punitive damages and "damages for the denials of [Henrius's] right to be free from cruel and unusual punishment and right to due process"]).

Defendants now move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure dismissing Henrius's remaining claims against them in the amended complaint in their entirety with prejudice. Although Henrius was served with defendants' motion on August 20, 2018, he has not filed any response to the motion, nor sought an extension of time to do so. Accordingly, by order dated January 2, 2019, the Court granted defendants' application to file the motion as unopposed.

II.     DISCUSSION

A.     Standard of Review

"Summary judgment is proper 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Zaretsky v. William Goldberg Diamond Corp.*, 820 F.3d 513, 519 (2d Cir. 2016) (quoting Fed. R. Civ. P. 56(a)). In ruling on a summary judgment motion, the district court must first "determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007) (internal quotations and citations omitted); *see Ricci v. DeStefano*, 557 U.S. 557, 129 S. Ct. 2658, 2677, 174 L. Ed. 2d 490 (2009) (holding that "[o]n a motion for summary judgment, facts must be viewed in the light most favorable to the nonmoving party *only* if there is a 'genuine' dispute as to those facts." (emphasis added) (internal quotations and citation omitted)); *Vermont Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 142 (2d Cir. 2014) ("The role of the court on a summary judgment motion is to determine whether, as to any material issue, a genuine factual dispute exists." (quotations and citation omitted)). On a motion for summary judgment, "[a] fact is material if it 'might affect the

outcome of the suit under the governing law[.]'" *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)).

In reviewing the record to determine whether there is a genuine issue for trial, the court must "construe the evidence in the light most favorable to the nonmoving party," *Dalberth v. Xerox Corp.*, 766 F.3d 172, 182 (2d Cir. 2014) (quotations and citation omitted), and "resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Smith v. County of Suffolk*, 776 F.3d 114, 121 (2d Cir. 2015) (quotations and citation omitted); *accord Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 59 (2d Cir. 2016). "An issue of fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Dalberth*, 766 F.3d at 182 (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. 2505); *see also Apotex*, 823 F.3d at 59. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Ricci*, 557 U.S. at 586, 129 S. Ct. at 2677 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)); *accord Baez v. JetBlue Airways Corp.*, 793 F.3d 269, 274 (2d Cir. 2015).

"The moving party bears the initial burden of showing that there is no genuine dispute as to a material fact." *CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*, 735 F.3d 114, 123 (2d Cir. 2013) (quotations, brackets and citation omitted); *see also Crawford v. Franklin Credit Mgmt. Corp.*, 758 F.3d 473, 486 (2d Cir. 2014). "[W]hen the moving party has carried its burden. . . , its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . [,]" *Scott v. Harris*, 550 U.S. 372, 380, 127 S. Ct. 1769, 167 L. Ed. 2d

686 (2007) (quoting *Matsushita Elec.*, 475 U.S. at 586-87, 106 S. Ct. 1348), and must offer "some hard evidence showing that its version of the events is not wholly fanciful[.]" *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (quotations and citation omitted). The nonmoving party can only defeat summary judgment "by adduc[ing] evidence on which the jury could reasonably find for that party." *Lyons v. Lancer Ins. Co.*, 681 F.3d 50, 56 (2d Cir. 2012) (quotations, brackets and citation omitted). "'The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient' to defeat a summary judgment motion[,]" *Fabrikant v. French*, 691 F.3d 193, 205 (2d Cir. 2012) (quoting *Anderson*, 477 U.S. at 252, 106 S. Ct. 2505); and "[a] court cannot credit a plaintiff's merely speculative or conclusory assertions." *DiStiso v. Cook*, 691 F.3d 226, 230 (2d Cir. 2012); *see also Fabrikant*, 691 F.3d at 205 ("[C]onclusory statements or mere allegations will not suffice to defeat a summary judgment motion." (quotations and citation omitted)). Since "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party[,] . . . [i]f the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." *Anderson*, 477 U.S. at 249-50, 106 S. Ct. 2505 (quotations and citations omitted).

### B.      Exhaustion of Administrative Remedies

Section 1997e(a) of the Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a).

"Accordingly, the PLRA does not require the exhaustion of all administrative remedies, but only those that are 'available' to the inmate." *Hubbs v. Suffolk County Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015); *see also Ross v. Blake*, --- U.S. ---, 136 S. Ct. 1850, 1855-56, 195 L. Ed. 2d 117 (2016) ("A prisoner need not exhaust remedies if they are not 'available.' . . . Under the PLRA, a prisoner need exhaust only 'available' administrative remedies."); *Williams v. Corr. Officer Priatno*, 829 F.3d 118, 123 (2d Cir. 2016) (holding that the Supreme Court's decision in *Ross* "fram[es] the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate.") Since "the ordinary meaning of the word 'available' is 'capable of use for the accomplishment of a purpose,' and that which 'is accessible or may be obtained[,]' . . . an inmate is required to exhaust those, but only those, grievance procedures that are 'capable of use' to obtain 'some relief for the action complained of.'" *Ross*, --- U.S. ---, 136 S. Ct. at 1858-59 (quotations and citations omitted).

In *Ross*, the Supreme Court articulated "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable of use to obtain relief[,]" *Ross*, --- U.S. ---, 136 S. Ct. at 1859, and, therefore, is not available. "First, an administrative remedy may be unavailable when it operates as a simple dead end-- with officers unable or consistently unwilling to provide any relief to aggrieved inmates. . . . Second, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use. . . . In other words, some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it. . . . Third, an administrative remedy may be unavailable when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Williams*, 829 F.3d at 123-24 (quotations and citations omitted). When any of

those circumstances arise, "an inmate's duty to exhaust 'available' remedies does not come into play." *Ross*, --- U.S. ---, 136 S. Ct. at 1859.

"[E]xhaustion is mandatory under the PLRA and . . . unexhausted claims cannot be brought in court[,]" *Jones v. Bock*, 549 U.S. 199, 211, 127 S. Ct. 910, 166 L. Ed. 2d 798 (2007); *see also Ross*, --- U.S. ---, 136 S. Ct. at 1856; *Woodford v. Ngo*, 548 U.S. 81, 86, 126 S. Ct. 2378, 165 L. Ed. 2d 368 (2006), "provided that remedies are indeed 'available to the prisoner.'" *Cicio v. Wenderlich*, 714 F. App'x 96, 97 (2d Cir. Mar. 16, 2018) (summary order) (quoting *Ross*, --- U.S. ---, 136 S. Ct. at 1856); *see also Hicks v. Adams*, 692 F. App'x 647, 648 (2d Cir. June 19, 2017) (summary order) ("Exhaustion is mandatory, as long as remedies are actually available.") "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532, 122 S. Ct. 983, 152 L. Ed. 2d 12 (2002); *accord Johnson v. Killian*, 680 F.3d 234, 238 (2d Cir. 2012); *Kearney v. Gebo*, 713 F. App'x 39, 41 (2d Cir. Nov. 13, 2017) (summary order).

"[T]he PLRA exhaustion requirement requires proper exhaustion," *Woodford*, 548 U.S. at 93, 126 S. Ct. 2378; *see also Johnson*, 680 F.3d at 238, "that is, using all steps that the agency holds out, and doing so properly." *Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (quotations and citation omitted); *see also Porter*, 534 U.S. at 524; 122 S. Ct. 983 ("All 'available' remedies must . . . be exhausted."); *Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007) ("[T]o satisfy the PLRA a prisoner must . . . procedurally exhaust his available administrative remedies." (emphasis omitted)). "This entails both completing the administrative review process in accordance with the applicable procedural rules . . . and providing the level of detail necessary

in a grievance to comply with the grievance procedures." *Amador*, 655 F.3d at 96 (alterations, quotations and citations omitted); *see also LionKingzulu v. Jayne*, 714 F. App'x 80, 81 (2d Cir. Mar. 13, 2018) (summary order) ("The PLRA requires 'proper exhaustion,' meaning exhaustion in 'compliance with an agency's deadlines and other critical procedural rules.'" (quoting *Woodford*, 548 U.S. at 90, 126 S. Ct. 2378)); *Kearney*, 713 F. App'x at 41 ("The PLRA . . . demands compliance with the prison grievance system's procedural rules regarding administrative remedies."); *Riles v. Buchanan*, 656 F. App'x 577, 579 (2d Cir. Sept. 1, 2016) (summary order) ("Untimely or otherwise procedurally defective administrative grievances or appeals fail to satisfy PLRA's exhaustion requirements." (quotations, alterations and citation omitted)). "The exhaustion inquiry . . . requires that [the court] look at the state prison procedures and the prisoner's grievance to determine whether the prisoner has complied with those procedures." *Espinal v. Goord*, 558 F.3d 119, 124 (2d Cir. 2009); *see also Jones*, 549 U.S. at 218, 127 S. Ct. 910 ("Compliance with prison grievance procedures[] . . . is all that is required by the PLRA to 'properly exhaust.' The level of detail necessary in a grievance to comply with the grievance procedures will vary from system to system and claim to claim, but it is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."); *Johnson*, 680 F.3d at 238 ("[P]risoners must complete the administrative review process in accordance with the applicable procedural rules-- rules that are defined not by the PLRA, but by the prison grievance process itself." (quotations and citation omitted)).

Since "failure to exhaust is an affirmative defense under the PLRA," *Jones*, 549 U.S. at 216, 127 S. Ct. 910, "defendants bear the initial burden of establishing, by pointing to legally sufficient sources such as statutes, regulations, or grievance procedures, that a grievance process

exists and applies to the underlying dispute[.]" *Hubbs*, 788 F.3d at 59 (quotations, alterations and citations omitted). "Once defendants have met their initial burden of demonstrating that a grievance process exists, . . . [the] plaintiff bears the burden of 'demonstrat[ing] that other factors . . . rendered a nominally available procedure unavailable as a matter of fact.'" *White v. Velie*, 709 F. App'x 35, 38 (2d Cir. Sept. 15, 2017) (summary order) (alterations in original) (quoting *Hubbs*, 788 F.3d at 59).

### 1. The NCCC's Inmate Grievance Procedure

Since defendants' assertions in their statement of undisputed material facts pursuant to Local Civil Rule 56.1 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York are properly supported pursuant to Rule 56(c) of the Federal Rules of Civil Procedure and are not controverted by Henrius, they are deemed admitted for purposes of this motion. *See* Fed. R. Civ. P. 56(e); *Jackson v. Fed. Express*, 766 F.3d 189, 194 (2d Cir. 2014) ("The non-moving party need not respond to the motion [for summary judgment]. However, a non-response runs the risk of unresponded-to statements of undisputed facts proffered by the movant being deemed admitted.")

The NCCC Inmate Handbook, effective as of April 1, 2010, of which every inmate receives a copy upon his or her arrival at the NCCC, (Def. 56.1, ¶ 1), provides a three (3)-step process for the handling of inmate grievances. (*Id.*, ¶ 3). To initiate the process, an inmate must complete a grievance form, available in the Inmate Law Library; during Inmate Council meetings; and, upon request, at the housing area officer's station, and file it, by "plac[ing] it into the grievance mailbox located in each housing area[,]" (Declaration of Stephanie L. White

["White Decl."], Ex. A at 4), "within five (5) days of the date of the act or occurrence leading to the grievance." (*Id.*). A grievance is defined, in relevant part, as "a written inmate complaint concerning either written or unwritten facility policies, procedures, rules, practices, programs or the action or inaction of any person within the facility." (*Id.*). "Any grievance that is too vague to understand or fails to set forth supporting evidence or information will be returned to [the grievant]," (*id.*) (emphasis omitted), and his or her "[f]ailure to supply sufficient information or evidence within two (2) days shall be cause to deny the grievance." (*Id.*) (emphasis omitted).

The grievance form is reviewed by a grievance coordinator. (Def. 56.1, ¶ 6). "Within five (5) business days of receipt of a grievance, the Grievance Coordinator will issue a written finding[,] . . . specify[ing] the facts and circumstance underlying [his or her] determination." (*Id.*). "A copy of such finding will be provided to [the grievant]." (White Decl., Ex. A at 4).

"Within two (2) business days after receipt of the Grievance Coordinator's written findings, [the grievant] may appeal a negative finding to the Chief Administrative Officer ['CAO']." (White Decl., Ex. A at 4). "Within three (3) business days of receipt of the [CAO's] determination, [the grievant] may appeal a grievance denied by the facility, in whole or in part, to the N.Y.S. Commission of Correction by indicating [his or her] desire to appeal on the Inmate Grievance form, in the space provided for such purpose." (*Id.* at 5). Accordingly, defendants satisfied their initial burden of demonstrating that a grievance process exists at the NCCC and the burden, thus, shifted to Henrius to demonstrate, by citation to evidence which would be admissible at trial, *see* Fed. R. Civ. P. 56(c), that other factors rendered that process "unavailable as a matter of fact." *White*, 709 F. App'x at 38. Henrius has not satisfied that burden; indeed, he

does not oppose defendants' summary judgment motion at all.[5]

### 2. Henrius's Grievances

Initially, the administrative scheme set forth in the NCCC's Inmate Handbook is clearly discernible and navigable to the ordinary prisoner and, thus, is not "so opaque that it becomes, practically speaking, incapable of use." *Williams*, 829 F.3d at 123-24 (quotations and citations omitted).

Moreover, the record reflects that Plaintiff was given, or otherwise received or had access to, a copy of the Inmate Handbook, (Def. 56.1, ¶ 11), and that prior to the date on which he filed the amended complaint, *i.e.*, June 11, 2013, he failed to fully avail himself of all of the available inmate grievance procedures set forth in the Inmate Handbook. (*Id.*, ¶ 14). Although Henrius submitted, and received the results of, thirteen (13) grievances pursuant to the initial step of the inmate grievance process prior to June 11, 2013, none of those grievances were fully appealed in accordance with the three (3)-step inmate grievance process set forth in the NCCC's Inmate Handbook. (*Id.*, ¶¶ 15-16). Specifically, Henrius submitted his first grievance (number 206-08-11) on August 24, 2011, complaining that the deputy issuing the commissary items refused to issue him a return after he received a bag of spoiled chocolate and requesting "[a] credit for the spoiled goods." (White Decl., Ex. B). However, Henrius withdrew that grievance after he

---

[5] In fact, it appears that Henrius has entirely abandoned his claims in this action. Not only did Henrius fail to oppose or otherwise respond to defendants' motion for summary judgment, he also did not appear for the pretrial conference held before this Court on March 18, 2019 at 11:15 a.m., notwithstanding that defendants served a copy of the order scheduling such hearing upon him by mailing a copy thereof to his last known address on January 3, 2019. (*See* DE 539). Indeed, Henrius has not even contacted this Court, much less taken any steps to prosecute his claims in this action, for more than twenty-one (21) months, *i.e.*, since June 1, 2017, when he filed a notice of change of address. (DE 460).

received another bag of chocolate. (*Id.*).

Henrius submitted his second grievance (number 208-11-11) on November 25, 2011, complaining that he was only seen by nurses for his sick calls and requesting that he be seen by a doctor. (White Decl., Ex. C). The grievance coordinator denied that grievance, and Henrius refused to sign that decision, *i.e.*, he did not accept or appeal the grievance coordinator's decision. (*Id.*).

Henrius submitted his third grievance (number 181-12-11) on December 25, 2011, complaining that on December 14, 2011, he never received his commissary bag, for which he was charged, and requesting a refund. (White Decl., Ex. D). The grievance coordinator accepted that grievance and had Henrius's inmate account credited fourteen dollars ($14.00), and Henrius accepted the grievance coordinator's decision. (*Id.*).

Henrius submitted his fourth grievance (number 136-01-12) on January 19, 2012, complaining that his "no meat tray" consisted of only eggs or salad for three (3) days and requesting that he receive tuna on every tray. (White Decl., Ex. E). The grievance coordinator accepted that grievance; had the kitchen supervisor made aware of the complaint; was informed that Henrius would receive more variety of meal choices; and advised Henrius that due to his dietary needs, "his choices may be slightly limited in comparison to inmates that have no dietary restrictions." (*Id.*). Plaintiff accepted the grievance coordinator's decision. (*Id.*).

Henrius submitted his fifth grievance (number 081-02-12A) on February 9, 2012, complaining that he was not receiving appropriate medical attention for a rash on his head and neck, and requesting that "proper continual medical attention be given to cure [his] illness until it is complete[,] ASAP[.]" (White Decl., Ex. F). The grievance coordinator accepted that grievance

after being informed by the medical staff that Henrius was examined and treated for the same condition on at least three (3) prior occasions, had been reevaluated on February 16, 2012 and was receiving pain medication and antibiotics as treatment. (*Id.*). Henrius refused to sign that decision, *i.e.*, he did not accept or appeal the grievance coordinator's decision. (*Id.*).

Henrius also submitted his sixth and seventh grievances (numbers 081-02-12B and 081-02-12C, respectively) on February 9, 2012. In his sixth grievance, Henrius complained that his dietary needs and restrictions were not being met "as per medical [and] NY State standards and guidelines," and requested that he be evaluated "by an approved and licensed dietician ASAP[] as to [his] needs while incarcerated." (White Decl., Ex. G). The grievance coordinator accepted that grievance after being informed by medical staff that Henrius was receiving food appropriate for his medical condition since November 30, 2011 and that his dietary orders, which consist of no red meat or poultry, were renewed every ninety (90) days, and were last renewed on February 10, 2012. (*Id.*). Henrius refused to sign that decision, *i.e.*, he did not accept or appeal the grievance coordinator's decision. (*Id.*).

In his seventh grievance, Henrius complained that disinfectant was not being made available for use with the hair clippers "and/or" the nail clippers and requested that "[d]isinfectants be made available for use upon request for the hair clipper and or the nail clipper[.]" (White Decl., Ex. H). The grievance coordinator accepted that grievance after being informed that disinfectant spray would be delivered to the housing area "in the very near future." (*Id.*). Henrius accepted the grievance coordinator's decision. (*Id.*).

Henrius submitted his eighth grievance (number 084-03-12) on March 11, 2012, complaining that the medication previously given to him to treat the bumps on the back of his

head was not working, as a result of which he now had "a large bump in different area of [his] head," and requesting that he "be taken to [an] outside hospital or doctor." (White Decl., Ex. I). The grievance coordinator accepted that grievance after being informed by the medical staff that lab work was performed; that the medical provider was awaiting the results thereof before adjusting Henrius's course of treatment; and that Henrius was being treated with medicated shampoo and educated about his chronic condition. (*Id.*). The grievance form indicates that Henrius was "unable to sign for medical reasons," but accepted the grievance coordinator's decision. (*Id.*).

Henrius also submitted his ninth grievance (number 086-03-12) on March 11, 2012, complaining that he did not receive a hot meal for dinner the night before and requesting that he receive his proper "no meat" trays. (White Decl., Ex. J). That grievance was returned to Henrius as too vague and he was directed to provide more details and information about his complaint, *e.g.*, an explanation of what he considers to be "proper trays" and what specific foods he was required to have, whether he filled out a sick call slip to modify his diet, and any additional documentation. (*Id.*). When Henrius failed to supply any additional information or evidence within two (2) days, grievance number 086-03-12 was closed. (*Id.*).

Henrius submitted his tenth grievance (number 025-04-12) on March 30, 2012, complaining that some of his clothes and linens were missing after he sent them to the laundry. (White Decl., Ex. K). However, Henrius subsequently withdrew that grievance after all of his items were returned. (*Id.*).

Henrius submitted his eleventh grievance (number 017-08-12) on August 1, 2012, complaining that the clothing department "always give[s] [him] a[n] issue" before his court

appearances, and requesting that he "be able to appear in court with [his] shoes together with the rest of [his] clothes without any issues at all[.]" (White Decl., Ex. L). That grievance was returned to Henrius as too vague and he was directed to provide more details and information about his complaint, *e.g.*, what he meant by "giving [him] issues about [his] shoes," the identity of the officer to whom he was referring, and any additional documentation. (*Id.*). When Henrius failed to supply any additional information or evidence within two (2) days, grievance number 017-08-12 was closed. (*Id.*).

Henrius submitted his twelfth grievance (number 163-04-13) on April 25, 2013, complaining that his sneakers were taken after a cell search and requesting that they be replaced.[6] (White Decl., Ex. M). That grievance was returned to Henrius as too vague and he was directed to provide more details and information about his complaint, *e.g.*, to provide the date of the incident, the identity of the officer to whom he was referring and a property receipt for the sneakers or proof of value of the items. (*Id.*). Henrius provided only a property receipt dated October 29, 2012, indicating that sneakers had been removed from his cell during a cell search. (*Id.*). The grievance coordinator determined that the grievance was non-grievable because it was too vague and the date of Henrius's property receipt "greatly exceed[ed] the five days of occurrence required to file a grievance." (*Id.*) Henrius accepted the grievance coordinator's decision. (*Id.*).

Henrius submitted his thirteenth grievance (number 002-05-13) on April 30, 2013, complaining that Armor's medical staff did not respond to his two (2) sick call slips pertaining to "severe pains in head" and requesting that "the issues at hand" be rectified. (White Decl., Ex. N).

---

[6] The amended complaint makes no reference to Henrius's missing sneakers.

The grievance coordinator accepted that grievance after being informed by the medical staff that they received a sick call slip from Henrius on April 26, 2013 and that Henrius was evaluated by medical staff on or about May 2, 2013, and Henrius accepted the grievance coordinator's decision. (*Id.*).

Far from demonstrating that any officer at the NCCC was "unable or consistently unwilling to provide any relief" to Henrius, *Williams*, 829 F.3d at 123-24 (quotations and citations omitted), the record evidence demonstrates that Henrius either received the relief he sought, or other appropriate relief which he accepted, for a majority of his grievances, exclusive of the three (3) grievances that were closed as too vague and/or non-grievable, *i.e.*, his ninth, eleventh and twelfth grievances. Specifically, Henrius withdrew two (2) of his grievances, *i.e.*, his first and tenth grievances, after receiving the relief he sought therein; and he also received either the relief he sought, or other appropriate relief which he accepted, with respect to five (5) of the eight (8) grievances on which the grievance coordinator rendered a decision, *i.e.*, his third, fourth, seventh, eighth and thirteenth grievances.[7]

Moreover, the record is devoid of any evidence from which a rational jury may reasonably infer that any prison administrator thwarted Henrius from taking advantage of any part of the grievance process "through machination, misrepresentation, or intimidation." *Williams*, 829 F.3d at 123-24 (quotations and citations omitted). Since a rational jury could not reasonably find that any officer or prison administrator at the NCCC was unable or consistently unwilling to provide any relief to Henrius or thwarted him from taking advantage of any part of

---

[7] The three (3) grievances for which Henrius did not accept the grievance coordinator's decision, *i.e.*, his second, fifth and sixth grievances, all relate this his deliberate indifference to medical treatment claims against Armor, which have previously been dismissed.

the grievance process, or that the NCCC's grievance process was not discernible or navigable to the ordinary prisoner, there is no genuine issue for trial with respect to the issue of the availability of administrative remedies at the NCCC.

Moreover, the record evidence demonstrates that Henrius did not properly exhaust any of his claims in the amended complaint, *i.e.*, he did not provide the requisite level of detail necessary to comply with the NCCC's grievance process with respect to three (3) of his grievances, nor did he ever complete the three (3)-step grievance process in accordance with the procedural rules set forth in the Inmate Handbook with respect to any of his grievances. Furthermore, Henrius did not file any grievance with respect to his claims in the amended complaint relating to, *inter alia*, sewage backups; the condition of the cells, *e.g.*, chipped paint, water leaks, feces and/or food on the walls, ceilings, floors, etc.; poor ventilation; the presence of insects or rodents; the operation or condition of the sinks, toilets or showers; the temperature of the cells; or being provided contaminated or unsanitary food. Since administrative remedies were available to Henrius, and he did not properly exhaust any of his remaining claims in the amended complaint, the PLRA precludes him from proceeding with those claims in this Court. *See Jones*, 549 U.S. at 211, 127 S. Ct. 910. Accordingly, defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is granted and Henrius's remaining claims in this action are dismissed in their entirety with prejudice for his failure to exhaust available administrative remedies.

III.    CONCLUSION

For the reasons set forth above, defendants' motion for summary judgment pursuant to

21

Rule 56 of the Federal Rules of Civil Procedure is granted and defendants are granted judgment as a matter of law dismissing Henrius's remaining claims in this action in their entirety with prejudice for his failure to exhaust available administrative remedies. The Clerk of the Court shall enter judgment in favor of defendants and close this case. Pursuant to Rule 77(d)(1) of the Federal Rules of Civil Procedure, the Clerk of the Court shall serve notice of entry of this order upon Henrius and defendants in accordance with Rule 5(b) of the Federal Rules of Civil Procedure.

The Court certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith and therefore *in forma pauperis* status is denied for the purpose of any appeal. *See Coppedge v. United States*, 369 U.S. 438, 444-45, 82 S. Ct. 917, 8 L. Ed.2d 21 (1962).

SO ORDERED.

_____/s/_____<br>
Sandra J. Feuerstein<br>
United States District Judge

Dated: March 22, 2019<br>
      Central Islip, New York